Application of OKLAHOMA TURNPIKE AUTHORITY.

No. 34736.  July 21, 1950.

Rehearing Denied July 27, 1950.

*221 P. 2d 795.*

336

Mitchell and Pershing, of New York City, N.Y., and Robinson, Shipp & Robertson, of Oklahoma City, for applicant, Oklahoma Turnpike Authority.

M. A. Cox, P. D. Erwin, and Donald Powers, Co. Atty., Lincoln County, all of Chandler, Lawrence Jones, of Bristow, Glasser & Glasser, of Enid, and Dan Moody, of Austin, Tex., for protestants.

WELCH, J. The applicant, hereafter referred to as the Authority, pursuant to statutory provisions of the Oklahoma Turnpike Act, Title 69, ch. 6, S. L. 1947, page 485, sec. 9, as amended·by Title 69, ch. 6, S. L. 1949, page 515, sec. 2; Title 69 O. S. Supp. 1949 Sec. 659, provided by resolution for the

issuance of Turnpike Revenue Bonds in the sum of $31,000,000. This application for the approval of such bonds is authorized in the discretion of the Authority by statutory provisions of the Act S. L. 1947, page 490, sec. 18, Title 69 O. S. Supp. 1949, sec. 668.

Notice of the hearing on such application was given in the manner provided by the last-cited section, and in due time appearance was made and protests against the issuance of the bonds were filed and presented by the board of county commissoners of Lincoln county, Oklahoma, board of education of the city of Chandler, Oklahoma, otherwise known as Independent School District No. 1 of Lincoln County, Oklahoma, Jesse Berry, Roy Dawson, Chas. T. Wright, Ed Marshall, Wayne Rozell, J. W. Turner, Glen R. Key, Victor D. Hellman, A. J. Betreumix, Luther Seaborn, E. C. Love, Blanche Gleckler, Albert C. Kelly, Al Clarke, John L. Collins, Ray O. Kelly, P. M. Moore, L. S. Thompson, L. B. Sneed, Joe Wheeler Etals, J. H. Dumas, H. W. Peden, Nora Peden, D. L. Kuykendall, Ted Herman, Sidney M. Groom, Viola E. Groom, Dick Cahill, Roy Clayton, W. C. Granam, and Amil Strella.

Thereupon this court gave precedence to the cause and heard and considered the matters and contentions presented by the applicant and all protestants in order to properly determine all questions presented and to reach the decision contemplated by that statute.

We have considered the written application filed June 21, 1950, written protest filed July 6th, protestants' offer of proof filed July 10th, amendment to offer of proof filed July 13th, applicant's response to offer of proof filed July 13th, offer of proof filed July 17th, amendment to protest and offer of proof filed July 17th, oral discussion and argument of counsel for both sides presented July 3rd, July 6th, July 10th, and July 17th, all oral requests to present proof and all documents and exhibits submitted and referred to, and all written briefs filed.

Numerous questions are presented which we number and discuss consecutively for convenience and to meet the method of presentation:

First Question: Is the act creating the Oklahoma Turnpike Authority a local or a special law in violation of Section 46, Article V of the Constitution of the State of Oklahoma?

Consideration of the section of the Constitution and of the language of the Turnpike Act above cited would seem to demonstrate that this question should be answered in the negative. The section of the Constitution lists a number of subjects of legislation as prohibited. The subject of this legislation is not included therein. This Act is based on the stated purpose "to facilitate vehicular traffic throughout the State" in the methods stated specifically. The act has all of the attributes of general law and none of the attributes of a local or special law as contemplated by the cited section of the Constitution. The building of public highways, including the building of such toll road or roads as may be constructed by the Oklahoma Turnpike pursuant to the provisions of the Oklahoma Turnpike Act, is not a matter affecting merely a particular locality or the inhabitants thereof; and laws pertaining thereto are not local or special laws since such public roads affect and serve the public at large, and such laws pertain to questions of subjects in which the entire state is interested.

Former decisions of this court supporting the conclusion here reached include Sheldon v. Grand River Dam Authority, 182 Okla. 24, 76 P. 2d 355, and Foley v. State, 157 Okla. 202, 11 P. 2d 928. We therefore answer the first question in the negative.

We observe that in section 22 of the Act under consideration it is "provided that until specifically authorized by the Legislature the provisions of this Act shall not be utilized to construct and operate any toll turnpike except between the cities of Oklahoma City and Tulsa." Under the cited decisions this

does not change our conclusion that this is a general act and not merely a local or special law as contemplated by the pertinent constitutional provision. No in point decision or text authority to the contrary is cited by protestants.

Second Question: Do Section 5 and Section 11 of the Act (Title 69 O. S. Supp. 1949, Sections 655 and 661,) authorizing the Authority to fix, revise, charge and collect tolls for the use of the turnpike project, violate the provisions of Section 18, Article IX of the Constitution vesting power and authority in the Corporation Commission to supervise, regulate and control transportation and transmission companies, and do the provisions of the Trust Agreement in relation to the fixing of tolls violate the provisions of Section 11 of the act?

Article 9, section 18 of the Constitution defines the duties and powers of the Corporation Commission and delegates to it, among other things, the duty of supervising, regulating and controlling all transportation and transmission companies doing business in the state in matters relating to the performance of their duties, and their charges therefor. Our court has decided that the Corporation Commission has the power to regulate public service corporations, but that those powers are limited, and that it has only such jurisdiction and authority as is expressly conferred upon it by the Constitution. See Southwestern Light & Power Co. v. Elk City, 188 Okla. 540, 111 P. 2d 820.

Section 34 of article 9 of the Constitution defines the term "transportation company" as to include any company, corporation, trustee, receiver or any other person owning, leasing or operating for hire a railroad, street railway, canal, steamboat line, and also any freight car company, car corporation or company, trustee, or persons in any way engaged in such business as a common carrier. The term "transmisson company" shall include any company, receiver or other person own-

ing, laying or operating for hire any telegraph or telephone line. The term "public service corporation" shall include all transportation and transmission companies, all gas, electric light, heat, light and power companies, and all persons, firms, corporations, receivers or trustees engaged in said business, and all persons, firms, corporations, receivers or trustees authorized to exercise the right of eminent domain, or having a franchise to use or occupy any right-of-way, street, alley or public highway, whether along, over or under the same, in a manner not permitted to the general public, and all persons, firms, corporations, receivers and trustees engaged in any business which is a public utility, or a public service corporation. The term "persons", as used in this article, shall include individuals, partnerships and corporations, singular as well as plural number.

Under the provisions of the Turnpike Act the Turnpike Authority is not a corporation or a person within the meaning of the foregoing section of the Constitution. It is specifically designated (see section 3 of the Act, Title 69, O. S. Supp. 1949, sec. 653), an instrumentality of the state, and its operations are held to be an essential governmental function of the state, and by section 14 of the act (Title 69 O. S. Supp. 1949, §664), the exercise of its powers is for the benefit of the people of the state, and the operation and maintenance of projects constitutes the performance of essential governmental functions.

Nor is it a transmission or a transporation company, as defined by the Constitution. In Application of Central Airlines, 199 Okla. 300, 185 P. 2d 919, this court held that the Corporation Commission's powers are limited to those expressly conferred upon it by the Constitution, and that the classes within the purview of the term "transportation company" as used in section 18, article 9 of the Constitution, are limited to those expressly named in section 34 of such article immediately

following the words "the term transportation company shall include." In that case the court held that the Corporation Commission had no constitutional jurisdiction over air transportation or those engaged therein. In the body of the opinion it is said:

"In view of what has been said we deem it manifest that according to the applicable rules of construction the meaning of the words 'transportation company' as used in section 18 is no broader than the subjects indicated in section 34 after the words 'shall include.' And in the absence of some clear showing that such conclusion is contrary to the legislative intent, to which rules of construction must yield (Kansas City Southern R. Co. v. Wallace, 38 Okla. 233, 132 P. 908, 46 L.R.A., N.S., 112) such restricted meaning must be deemed to reflect the legislative intent. Under this construction, the express declaration of what is to be included leaves no room for enlargement through implication.

"Considering the constitutional provisions as a whole and the attendant circumstances we find nothing to indicate that said construction should be contrary to the intent of the framers of the Constitution. And considering the indefinite meaning of the term 'transportation company', in view of that which it is declared to include, and that some definition was needed for guidance of the commission in the exercise of the powers granted, and that the Legislature was granted authority to expand the classes to which the power of the commission applied under the provisions of the Constitution (sec. 18, art. IX), thus contemplating the event of classes not then in mind, we are confirmed in the view that our construction is declaratory of the intent of the framers of the Constitution."

We hold that the Oklahoma Turnpike Authority is not such a transportation company as is contemplated by the constitutional provisions referred to, and that the Turnpike Act does not in any manner violate the provisions of the Constitution dealing with the power and authority of the State Corporation Commission, and we specifically hold that such constitutional provisions are not violated by the provisions in the act authorizing the Authority to fix, revise, charge and collect tolls for the use of the turnpike project.

Since the act confers valid power on the Authority to so fix and collect tolls, no violation of this provision of the Constitution is involved in the promise to fix and collect tolls, which promise is made by the Authority in the trust agreement executed in connection with the sale of the bonds herein presented for approval.

Third Question: Does the act exempting the Authority from the payment of taxes or assessments upon any turnpike project or property acquired or used by it, and exempting the bonds from taxation violate the provisions of section 50, article V of the Constitution which provides that the Legislature shall pass no law exempting any property within this state from taxation except as otherwise provided in the Constitution.

Section 6 of article 10 of the Constitution provides for the exemption of certain property from taxation, and therein exempts all property used for free public libraries, free museums, public cemeteries, property used exclusively for religious and charitable purposes, and all property of the United States and of this state, and of counties and municipalities of this state.

Section 17 of the act (Title 69 O.S. Supp. §667), provides that when all bonds issued under the provisions of the act have been paid, such project may, under the terms of the act, become a part of the state highway system, and shall thereafter be maintained by the State Highway Commission, free of tolls. This clearly establishes that the turnpike project is the property of the State of Oklahoma. It cannot be mortgaged or incumbered. Only the tolls and revenues may be pledged to retire the bonds.

In Sheldon v. Grand River Dam Authority, supra, it is said:

"Plaintiff also waives his objection No. 9, attacking the act as violating

section 50 of article 5 for the reason that it purports to exempt property from taxation, and says: 'It is the belief of the plaintiff that the property exempt from taxation by reason of this act, to wit: the bonds, is such property as can be exempt from taxation without violating this constitutional provision for the reason that such bonds are instrumentalities of Government.' With this conclusion we agree. In re Assessment of First Nat. Bank of Chickasha, 58 Okla. 508, 160 P. 469, L.R.A. 1917B, 294.''

In Commodity Credit Corporation v. County of Oklahoma, 36 Fed. Supp. 694, the Federal District Court held that the Commodity Credit Corporation was not taxable by the State of Oklahoma for the reason that it is an instrumentality of the Federal Government. In the body of the opinion it is said:

"In Graves v. New York ex rel. O'-Keefe, 306 U. S. 466, 59 S. Ct. 595, 83 L. Ed. 927, 120 A.L.R. 1466, the Supreme Court said, in speaking of federal corporate instrumentality: '. . . And when the national government lawfully acts through a corporation which it owns and controls, those activities are governmental functions entitled to whatever tax immunity attaches to those functions when carried on by the government itself through its departments."

In State v. Galyon, 154 Okla. 204, 7 P. 2d 484, the Commissioners of the Land Office of Oklahoma acquired by foreclosure a tract of land. At that time county taxes were due upon the land. The court held that the tax lien was not a lien against the state; that when property is acquired by the state it is thereupon absolved and freed of further liability for the payment of taxes.

In State v. Mayes, 174 Okla. 286, 51 P. 2d 266, the court held that land acquired by a city and held through the City Water Commission was not subject to county taxes, and the fact that the city sold water therefrom to private persons and other municipalities outside its corporate limits and sold boating privileges and licenses upon its water supply reservoir in no wise affected the property or rendered it liable for taxation.

In Re Assessment of First National Bank of Chickasha, 58 Okla. 508, 160 P. 469, it is held in paragraphs 1, 2, 3 and 7 of the syllabus:

"The power to exempt from taxation, as well as that of taxation, is an essential attribute of sovereignty. Generally, the power to make exemptions is included or involved in the right to apportion taxes, and exists in the supreme legislative power, unless expressly forbidden by constitutional limitation.

"Section 50, art. 5 of the Constitution, prohibiting the Legislature from passing laws exempting any property within the state from taxation, except such as is named in section 6, art. 10, was not intended to prohibit the Legislature from exempting from taxation the bonds of the state, issued in aid of its governmental functions. Such bonds being instrumentalities of government, do not constitute property within the meaning of the constitutional limitations against exempting property from taxation.

"There being no constitutional obstruction forbidding the Legislature from exempting from taxation the bonded indebtedness of the state, in the form of the state public building bonds, it follows, necessarily, that the act exempting said bonds from taxation is not, in that respect unconstitutional.

"The intention of the Legislature to exempt the bonds from taxation being indubitable, the right to tax such bonds, whether directly or in legal effect, can be exercised under no circumstances, and is not therefore dependent upon the character of the owner or the statute under which the tax is assessed."

We therefore answer this third question in the negative.

Fourth Question: Are the bonds, as authorized to be issued, an indebtedness of the State of Oklahoma in violation of section 23, article X of the Con-

stitution as amended, or of sections 24 and 25, article X of the Constitution?

These three sections of the Constitution have been presented to and passed upon by this court in numerous decisions on similar revenue bond issues. It has been uniformly held that these sections apply only to such debt, obligations or deficit for the payment of which resort might properly be had to the taxing power of the state.

In the instant case it is expressly provided that the bonds shall be payable solely from the revenues to be derived from the operation of the toll road in question. That provision is carried forward into the bonds themselves. It is thoroughly well settled by former decisions of this court, that such bonds, and that these bonds, do not constitute an indebtedness against the State of Oklahoma as contemplated in the above-stated sections of the Constitution. See Baker v. Carter, 165 Okla. 116, 25 P. 2d 747; Sheldon v. Grand River Dam Authority, supra; Wickham v. Grand River Dam Authority, 189 Okla. 540, 118 P. 2d 640; State v. Grand River Dam Authority, 195 Okla. 8, 154 P. 2d 946; In re Application Board of Regents, 195 Okla. 641, 161 P. 2d 447; In re Application of Board of Regents Okla. A.&M. College, 196 Okla. 622, 167 P. 2d 883; In re Application of Oklahoma Planning and Resources Board, 201 Okla. 178, 203 P. 2d 415.

Therefore, we answer the fourth question in the negative.

Fifth Question: Are the Revenue Turnpike Bonds authorized to be issued an indebtedness of the state which requires the endorsement thereon of a certificate signed by the Auditor and the Attorney General of the state in accordance with section 29, article X of the Constitution?

Section 29 of article 10 of the Constitution provides that no bond or evidence of indebtedness *of this state* shall be valid unless the same shall have endorsed thereon a certificate, signed by the Auditor and the Attorney General of the state, showing that the bond or evidence of debt is issued pursuant to law and is within the debt limit.

Since we have found that the revenue turnpike bonds here involved do not constitute an indebtedness *against the state,* they are not required to be issued within any specified debt limit of the state, and, therefore, need no endorsement that they are within any definite limit, and as to these bonds there is of course no field for operation of the constitutional requirement as to certificate by the Auditor and the Attorney General that these bonds are issued according to law.

As hereinbefore pointed out, the Act in section 18 (Title 69 O. S. Supp. 1949 §668), provides for determination by this court whether the bonds are issued pursuant to law. We therefore answer the fifth question in the negative.

Sixth Question: Does the title of the act violate the provisions of section 57, article V of the Constitution which provides that every act of the Legislature shall embrace but one subject which shall be clearly expressed in its title?

The title of the Oklahoma Turnpike Act is as follows:

"An Act to facilitate vehicular traffic in the State of Oklahoma by providing for the construction, maintenance, repair, and operation of modern express highways, called 'Turnpike Projects'; creating a body corporate to be known as the Oklahoma Turnpike Authority; fixing its membership and defining its powers and duties; authorizing the Authority to finance the construction of any such project by the issuance and sale of turnpike revenue bonds which shall not constitute indebtedness of the State but shall be payable solely from tolls and other revenues of the project for which they are issued; authorizing the Authority to fix the terms and security and to provide for the refunding and redemption of such bonds; providing that in the issuance and sale of such bonds no

other law need be complied with; authorizing the Authority subject to the approval of the Corporation Commission of Oklahoma to exercise certain powers; to accept certain Federal Aid grants and to make any contracts and to do any and all things necessary or convenient to carry out the powers herein granted; authorizing the Authority to fix the location of turnpike projects; specifying the time in which such project shall be commenced; to acquire by purchase or condemnation such public or private lands or other property as may be required for such projects; to change the grade of certain highways and to separate grades between turnpike projects and other highways; authorizing the Authority to use lands belonging to the State upon certain conditions and authorizing cities, towns and political subdivisions to lease, lend, or grant property to the Authority; authorizing the Authority and the county commissioners of any county in which any such project is located to relocate any highway intersecting such project; limiting the size of any construction unit which the Authority may let; authorizing the Authority to police any project and the operation thereof; authorizing the Authority to fix, revise, and collect tolls and other revenues for the use any turnpike project and the right-of-way thereof to pay the principal and interest of the bonds issued to pay the cost of such project, and to pay the cost of the maintenance, repair, and operation thereof; declaring the authority, in exercising the powers herein granted shall be deemed to be performing a governmental function; exempting the Authority, any property acquired under this Act, the income from any bonds, the bonds issued under this Act their transfer and income therefrom and any profit made on the sale thereof from taxation; providing that when all the bonds issued for the payment of any project have been paid in full, the project shall become a free highway; authorizing the Authority to institute certain actions before the Supreme Court of Oklahoma, prescribing the procedure therefor, and defining the authority and duty of such court with respect thereto; providing the Authority may not until authorized by the Legislature utilize this Act to construct any turnpike project except between Oklahoma City and Tulsa, and providing that such project be located within one-half (1/2) mile of the city limits of certain cities and towns; fixing the minimum wages to be paid in the construction of any project providing that this Act shall be liberally construed; providing that the provisions of this Act are severable and the invalidity of one or more provisions shall not affect the validity of the remainder; and repealing all acts or parts of acts in conflict herewith."

This court has many times held that the fact that an act of the Legislature involves many details does not offend the requirement that each act shall embrace but one subject, so long as all of the duties and details relate to the same general subject, and has said that section 57, article V of the Constitution is not to be construed in such manner as to hamper or unreasonably restrict the Legislature in the performance of its duties. See Musick v. State, 185 Okla. 140, 90 P. 2d 631, and In re Funding Bonds of 1941, 190 Okla. 8, 119 P. 2d 558. It is not really necessary that the title of a legislative act should contain such an elaborate statement of the subject of the act as is here set out. We find this title to be quiet ample and wholly sufficient. Gibson Products Co. Inc. v. Murphy, 186 Okla. 714, 100 P. 2d 453. Of course, it is not necessary that every detail of the legislative act be forecast in its title. Stewart v. Oklahoma Tax Commission, 196 Okla. 675, 168 P. 2d 125. In the face of this comprehensive title the protestants point out a number of details of the act which are not set out in the title, but that was not necessary for the reasons stated. We therefore answer this sixth question in the negative.

Seventh Question: Does the Act contain a delegation of powers in violation of the Constitution?

This act in appropriate language provides that the Authority may construct and build toll roads, and fix and collect tolls, and issue and sell bonds, and pay them from tolls collected. That in

general is the purpose of the Authority and its power. It is wholly unnecessary to copy the act here. It of course contains many detailed provisions as to how the Authority may proceed and what it may do in the accomplishment of the overall purpose of its existence, and it is given the power and delegated the authority to do and perform those things. But the Authority is not delegated any power beyond the purposes of the Act. In short, this Act delegates all power necessary to the accomplishment of the purposes of the Act, but beyond that it does not delegate to any one any of the powers of the state. This is the first time this court has been called upon to construe an Act creating a turnpike authority, but similar acts have been construed in other states. See State v. Diffenbacher, 153 Ohio, 268, 91 N. E. 2d 512; City of Elizabeth v. New Jersey Turnpike Authority (N. J.) 72 Atl. 2d 399. The provisions of this Act delegating the power to function and perform under the Act does not constitute delegation of any power in violation of the Constitution.

Eighth Question: Do the maturities of the bonds violate the provisions of section 9 of the act requiring the bonds to mature in annual installments, or the provisions of section 25, article X of the Constitution limiting the maturity of the bonds of the state to twenty-five years?

The bonds here involved are, as to maturities, in accord with the provisions of section 9 of the Act, and are not such bonds as come within the provisions of section 25, article 10 of the Constitution. That provision applies to bonds *of the state,* which create state indebtedness, and such bonds must follow that constitutional provision as to maturities to coincide with the providing of public revenue for their payment. Therefore, and for the further reasons stated in determining preceding questions, we answer question number Eight in the negative.

Ninth Question: Is the Turnpike Authority a State Instrumentality with sovereign power?

The exact purpose of this question is not readily apparent, nor is its pertinency to the controlling issues here. The Authority is obviously a species of state instrumentality, with the power granted and limited by the act. Certainly numerous acts or things which the Authority may do within its statutory power could also be done by the state within its sovereign power. But it is equally obvious that the Authority does not possess all sovereign power, nor even a majority of the powers of the sovereign state. Therefore, in the broad sense it is not "with sovereign power" or with the power of the sovereign.

The protestants urge that this act should be distinguished from the Grand River Dam Act and the Dormitory Bond Acts, and that therefore the cited decisions upholding those acts have no application here. We find, however, that a comparison of all these acts, and the reading of those decisions demonstrates to our satisfaction that such contention is not well founded.

Tenth Question: Does the Turnpike Act violate the Constitution by surrendering the power of taxation and granting exclusive rights, privileges and immunities?

The protestants pose this question and seek an affirmative answer on the stated authority of the following cases: Tax Commission v. Magnolia, 336 U. S. 342, 69 Sup. Ct. 561; Helvering v. Mountain Producers Corp., 303 U.S. 376, 58 Sup. Ct. 623, Santa Rita Oil & Gas Co. v. State Board of Equalization, 112 Mont. 359, 116 P. 2d 1012, 136 A.L.R. 757; In re Assessment of Chickasha Cotton Oil Co., 80 Okla. 101, 194 P. 215. Those cases involve private rights and liabilities. More particularly they involve efforts to obtain tax exemption of private property under general law. It is enough to say they do not support the contention here made.

Protestants also cite Wenner v. Mothersead, 129 Okla. 273, 264 P. 816. There it was held that certain property taken over and held by bank commissioners for specified purposes had no exemption from taxation. Also cited is Kansas, O. & G. Ry. Co. v. Johnston, 136 Okla. 301, 278 P. 271, holding merely that a privately owned toll bridge possessed no immunity from taxation, and Guthrie Daily Leader v. Cameron, 3 Okla. 677, 41 P. 635, holding that special or exclusive privileges and immunities could not be granted to a privately owned and operated company. We have considered the point, but do not find in said decisions any authority for the contention here made.

This Oklahoma Turnpike Act surrenders no power of taxation. It sets out certain specific exemptions from taxation which we have heretofore demonstrated and determined to be valid. The act might be said to grant to the Authority the exclusive right, in the public interest, to build and operate this toll road, with the exclusive privilege of collecting tolls on the road within the limits and for the purposes stated. But there is no implication that this denotes a "granting to any association, corporation or individual any exclusive rights, privileges, or immunities" as is prohibited by art. V, section 51 of the Constitution. We therefore answer this tenth question in the negative.

Eleventh Question: A provision of Section 4 (c) of the Act is quoted as follows: "Any obligation or expense hereafter incurred by the State Highway Commission with the approval of the Authority for traffic surveys, borings, preparation of plans and specifications, and other engineering services in connection with the construction of a project shall be regarded as a part of the cost of such project and shall be reimbursed to the State out of the proceeds of turnpike revenue bonds hereinafter authorized."

And the question is presented whether this provision renders the Act invalid.

The major portion of subdivision (c) of section 4 is employed to detail the various items that go into or to make up the aggregate costs of a turnpike project. The quoted portion merely .authorizes as a part of the cost of such a project that any preliminary obligation or expense incurred by the Highway Commission with the approval of the Authority shall be reimbursed as part of the costs of the project. There is no requirement that the Highway Commission shall expend any particular amount, or any amount at all, in that regard. In fact, the Act does not specifically authorize any such expenditure at all, but merely makes provision for reimbursement if any such expenditure shall be so made. It is as if the provision had authorized reimbursement of funds so expended in advance by any one.

The question whether the Highway Commission should so expend any monies is not exactly a proper question for determination in this proceeding, but we discuss it in our desire to consider every contention made by protestants. Of course, the Highway Commission has general authority over the state to incur such preliminary expense in reference to highway construction, and when they incur such expense, on any particular line or route, the expenditure is not rendered illegal if that route or line is thereafter taken over by the Turnpike Authority and a toll road constructed thereon. It is only sound business and fair that in such an instance the Turnpike Authority should make reimbursement. In a case of such preliminary work and expense by the Highway Commission, even though made in possible contemplation of toll road construction by the Authority, if the Authority should fail or decline the line or route for toll road, the line or route might well be utilized as and for a portion of the state system of free roads. Thus it seems clear that any such preliminary work and expense that is generally done, or might be done, by the Highway Commission, would be in exact accord with its general duties

and would be thoroughly covered by and included in the appropriation of money to the Highway Commission, or for general use by the Highway Commission within the scope of its duties as to the public highways of the state.

In Oklahoma appropriations to the Highway Commission, or for its expenditure, are not made by the line method. House Bill No. 421 of the 1949 Legislative Session, page 673, S. L. 1949, appropriates to the State Highway Department all unencumbered funds remaining in its hands, including contributions of aid by the United States Government. Expenditure of this aggregate fund is authorized in broad general terms for the operation of this Department and of the State Highway Commission, and in the general discharge of its road building duties. This appropriation was made in the same manner as highway appropriations have been handled in previous years, and they have always been sustained. In Black v. Oklahoma Funding Bond Commission, 193 Okla. 1, 140 P. 2d 740, it is said:

"(11, 12) Of the fifth ground of attack we observe that the act became law before the end of the fiscal year 1942-43 and therefore the amount of surplus which would accrue in the fund could not be stated in a definite amount when same was passed. As to the suggestion that the act does not distinctly specify the sums appropriated, we observe that the act devotes the entire surplus, whatever it may be when capable of ascertainment, to the purposes therein specified. The case of Edwards v. Childers, 102 Okla. 158, 228 P. 472, is controlling in that regard. Therein we held in paragraph three of the syllabus as follows: 'A legislative act creating a special fund, all of which is, by the terms of the act, appropriated and directed to be expended for a special purpose and in an express manner amounts to an appropriation of the entire fund so created, and where the amount accruing to and paid into said fund is capable of being definitely ascertained, it is sufficiently definite and certain to comply with the provisions of article 5, §55, of the Constitution.'

"(13) In this act the Legislature created a special fund of this surplus which was capable of specific ascertainment by ordinary bookkeeping methods and calculations at a time previous to the time when the law should be first administered. Nor does the act violate the provisions of section 23, article 10 of the Constitution as amended in 1941 to provide that appropriations shall be based upon estimate of revenue. We find no violation of the constitutional provisions invoked in that ground of attack."

In Edwards v. Childers, 102 Okla. 158, 228 P. 472, it is held in the syllabus as follows:

"The 'appropriation of money' is the setting it apart formally or officially for a special use or purpose, and, where that is done by the Legislature in clear and unequivocal terms in a duly enacted law, it is an 'appropriation.' State ex rel. Bonsteel v. Allen, 83 Fla. 214, 91 South. 104, 26 A. L. R. 735. (Citing Words and Phrases, First Series, Appropriation.)

"No arbitrary form of expression or particular words are required by the Constitution in making an appropriation, which may be made by implication, when the language employed reasonably leads to the belief that such was the intention of the Legislature. Menefee v. Askew, 25 Okla. 623, 107 P. 159, 27 L. R. A. (N.S.) 537.

"A legislative act creating a special fund, all of which is, by the terms of the act, appropriated and directed to be expended for a special purpose and in an express manner amounts to an appropriation of the entire fund so created, and where the amount accruing to and paid into said fund is capable of being definitely ascertained, it is sufficiently definite and certain to comply with the provisions of article 5, §55, of the Constitution.

"Where a special fund is created from sources not coming from, or out of, the general revenue fund of the state, the authority to the official board or commission to spend said fund for a special purpose may be granted where the authority to disburse said fund or ob-

ligate the state is limited to the amount of money that may go into said fund, and such officer is not permitted to incur an indebtedness against the state which may be payable out of, or charged against, the general revenue funds of the state.

"The construction, maintenance, and repair of a system of state highways is incapable of being arbitrarily classified and itemized as to the amounts that may be expended for various purposes, in view of the fact that such amounts cannot be ascertained in advance of the work and the further fact that such work is usually constructed through federal, county, city, and township aid, and for these reasons a lump sum or amount may be, by the Legislature, appropriated for such purpose.

"Section 3 of chapter 101 and section 8 (e) of Chapter 48, of the Session Laws of 1923-24, are valid appropriations of public funds for purposes stated and do not contravene the provisions of article 5, §55, of the Oklahoma State Constitution."

The fact that tolls are charged for the use of the proposed turnpike project until the bonds are paid does not affect its status as a "public highway." The Supreme Court of the United States, in County Commissioners v. Chandler, 96 U. S. 205, 24 L. Ed. 625, in referring to a toll bridge financed by an issue of county bonds, said:

"All persons, of whatever place, condition, or quality, are entitled to use it as a public thoroughfare for crossing the river. The fact that they are required to pay toll for its use does not affect the question in the slightest degree. Turnpikes are public highways, notwithstanding the exaction of toll for passing on them."

In the case of New York Tunnel Authority v. Consolidated Edison Co., 295 N. Y. 467, 68 N. E. 2d 445, it was held that the Queens Midtown Tunnel, the construction of which was financed by an issue of revenue bonds payable solely from toll, was "plainly a public highway improvement."

Our attention is directed to a portion of the New Jersey Turnpike Act which was held unconstitutional. That provision was as follows:

"The State Highway Department is hereby authorized in its discretion to expend out of any funds available for the purpose such moneys as may be necessary for the study of any turnpike project or projects and to use its engineering and other forces, including consulting engineers and traffic engineers, for the purpose of effecting such study and to pay for such additional engineering and traffic and other expert studies as it may deem expedient, and all such expenses incurred by the department shall be paid by the department and charged to the appropriate turnpike project or projects, and the department shall keep proper records and accounts showing each amount so charged. Upon the sale of turnpike revenue bonds for any turnpike project or projects, the funds so expended by the department in connection with such project or projects shall be reimbursed by the Authority to the department from the proceeds of such bonds."

The difference is readily apparent between this quotation and the last-quoted provision of our own act. This provision of the New Jersey Act grants very broad discretion to the Highway Department of that state. Its expenditure of state highway funds in aid of a Turnpike project is not specifically limited to preliminary expenses. In New Jersey Turnpike Authority v. Parsons, 3 N. J. 235, 69 A. 2d 875, that provision was held to constitute an unconstitutional delegation of power to the Highway Department. It was noted that under such provision there was no limit upon the funds which might be turned over to the Turnpike Authority, and it was said "it would be possible for the State Highway Commissioner year by year to turn over all of his funds to the Turnpike Authority," and it was said further that "by placing this power in the hands of the State Highway Commissioner, the Legislature is, pro tanto, abdicating its power over the purse strings to a Department head." It is thus apparent that this decision relied

upon by protestants is not in point here. This is true because of the absence of a similar provision from our Turnpike Act, and, also, because of the general power existing in our State Highway Commission to expend funds generally in preliminary highway construction work throughout the state. It would be another matter if our Turnpike Act contained such a broad and sweeping provision as that invalid provision of the New Jersey act.

This New Jersey decision was considered by the Supreme Court of Ohio, in State v. Deffenbacher, 91 N. E. 2d 512. That court thought the New Jersey decision was not justified under the statutes of New Jersey. The Ohio court in its opinion said:

"Our attention has been called to New Jersey Turnpike Authority v. Parsons, Atty. Gen., 3 N. J. 235, 69 A. 2d 875, 881, decided by the Supreme Court of New Jersey on December 5, 1949. That case held a statute substantially similar to Section 1220, General Code, invalid because contrary to the constitutional provision substantially similar to Section 22 of Article II of the Ohio Constitution.

"It does not appear, from the report of that case, just what appropriations had been made to the New Jersey highway. department. The opinion of the New Jersey court points out that no appropriation was made to the turnpike authority and then states that the services to be rendered by the highway department were 'for a project . . . not within the scope of the duties confided to' the highway department. In our opinion, this latter statement disregards the provisions of the New Jersey statute, corresponding to Section 1220, General Code, which authorizes the New Jersey highway department to render those services."

And further in the body of that opinion the Ohio court stated:

"In New Jersey Turnpike Authority v. Parsons, Atty. Gen., supra, the Supreme Court of New Jersey held that the New Jersey statute, substantially similar to Section 1220, General Code (except that it did not confer authority upon a controlling board), was invalid as a delegation of legislative power to the highway commissioner. On this question the opinion of the New Jersey court states merely that 'the delegation to the discretion of the State Highway Commissioner of how much of his funds shall be turned over to an autonomous public corporation' cannot 'be justified.' Apparently, what the New Jersey court had in mind was that authority to construct the turnpike had been conferred on what corresponds to our turnpike commission and discretionary authority to help in planning that construction could not, therefore, be conferred on the highway commissioner. This amounts to saying that, in the construction of a project, the state Legislature cannot authorize one agency to construct it and authorize another agency at its discretion to help in planning it, even when such help is to be given only on request of the first agency. In our opinion, the General Assembly does have power to do that."

And we are impressed with the specially concurring statement of Chief Justice Weygandt in that case as follows:

"The justice in this case is a simple one.

"It is not an over-simplification to state that, reduced to its lowest terms, the problem presented at this time involves merely the authority of the relator as the Director of the Department of Highways of the State of Ohio to use money concededly appropriated by the General Assembly for his use in the 'highway improvement fund.' It is conceded, too, that the money is available in that fund. Furthermore, it is not disputed that the proposed turnpike is directly related to the improvement of the highway system of the state. Hence, it would seem that even without the enactment of Section 1220, General Code, the relator possesses the authority to expend available funds for a study of the feasibility of a so-called turnpike or any other project directly related to the improvement of the highway system of the state."

It is the contention of the protestants that this last above quoted provision

of the Oklahoma Turnpike Act provides for expenditures without appropriation, in violation of constitutional restriction. That contention cannot be sustained for the reasons stated, and we therefore answer the eleventh question in the negative. The quoted provisions do not render the Turnpike Act invalid.

Twelfth Question: Is the plan of construction of the toll road a violation of the terms of the statutes and an illegal use of trust funds?

Here we are not in any manner concerned with the details of construction of the road or any part thereof except the location of the ends thereof. The protestants point out that according to present plans the toll road will run from a point "six miles from the business section of Tulsa" (offer of proof 9) to a point ". . . about fifteen miles from the business district of Oklahoma City . . ." (protestants brief 49 A).

The act in section 5, subdivision (e), provides that the toll road ". . . shall extend between the cities of Tulsa and Oklahoma City . . ." Protestants urge the construction plan as erroneous apparently on the contention that the toll road at each end thereof must extend to or into the city limits or into the business districts of Tulsa and Oklahoma City. We find no such plan of construction to be contemplated or required by the act. It would seem impracticable to locate the termini of a much traveled toll road so as to empty travel thereon into the business district or into a thickly populated residential area of either of these two large cities. It would seem more workable to locate such termini near to, or at least some slight distance removed from the city limits of either city. It may be that this is common knowledge. At any rate, we assume it to be within the discretion of the proper authorities to so construct such a toll road and to so construct this toll road. It does not appear that this point presents the slightest abuse of discretion, and certainly it does not

disclose any violation of the Turnpike Act and this twelfth question is answered in the negative.

Thirteenth Question: Protestants generally question the constitutional authority of the Legislature to pass a Turnpike Act. They call attention to Art. 16, Sec. 1 of the Constitution which is as follows:

"The Legislature is directed to establish a Department of Highways, and shall have the power to create improvement districts and provide for building and maintaining public roads, and may provide for the utilization of convict and punitive labor thereon."

We find therein no such restriction as would deny power to pass this Turnpike Act and no decision is cited to that effect. Though several states have adopted Turnpike Acts, we are cited to no decision or legal theory that would generally deny legislative power so to do. As to the power generally of the Legislature, see Prairie Oil & Gas Co. v. District Court, 71 Okla. 32, 174 P. 1056; and Wentz v. Thomas, 159 Okla. 124, 15 P. 2d 65, and In re Block 1, Donly Heights Addition, Oklahoma City, 194 Okla. 221, 149 P. 2d 265. We hold the passage of this act was within the authority of the State Legislature.

Fourteenth Question: Is the Turnpike Authority transacting business for the benefit of private investors, and therefore prohibited by the Constitution from exercising the power of eminent domain?

We think this presents a novel and narrow view of the purpose and operation of the authority, to say the least of it. We do not see where this exact question bears directly upon the question whether this bond issue should be approved. The public purpose of the Turnpike Act and the operations of the Authority are sufficiently disclosed heretofore. We dispose of this question on our conclusion that the Authority is not transacting business merely for the benefit of private investment.

Fifteenth Question: The protestants question the authority of the state to close section line roads in the construction of this toll road.

This is on the theory that the toll road will be so constructed as to eliminate the grade crossings thereof without providing an underpass or overpass at each point where the toll road will cross a section line. The construction plan provides for various roads to cross the toll road either by overpass or underpass construction. Additional such crossings of the toll road may of course be constructed in the future when and as needed. The general powers of the state in such matters seems too well settled to require much citation of authorities. However, see White v. Dowell, 49 Okla. 589, 153 P. 1140. We dispose of this question by denying it for the lack of cited authority to sustain it.

Sixteenth Question: Protestants assert that the Turnpike Act denies due process of law and by brief and by oral argument criticism is made of the provisions of the Act as to notice of application for approval of a bond issue, and, also, criticism is made of the lack of detail provision as to procedure in this court. All this criticism is directed at the proceedings in this application for approval by this court of this particular bond issue.

The act provides for ten days' published notice of the presentation to this court of an application for the approval of the bond issue. That notice was properly given specifying July 6th as the date when the application would be presented and as the date when any protestant might appear for the purpose of protest. These protestants appeared by members of counsel on July 3rd at which time some argument or preliminary suggestions were made to the court, thus advising the court of the desire of these protestants to appear on July 6th. On July 6th these protestants appeared and presented their written protests and filed written brief in support thereof which comprehensively covered the protests, although denominated preliminary brief of protestants.

On the same day the matters involved were discussed at some length by counsel for both sides. It thereupon developed that the protestants desired to present or offer to present certain oral testimony and evidence. At the conclusion of that hearing this court was of the view that the fact items then referred to by counsel for protestants in oral argument were not material to the questions of law presented in the application and protests before the court and all counsel were so advised. Thereupon counsel for protestants, upon inquiry by the court, announced their desire to make formal offer of proof of certain facts, and upon their request they were granted additional time until July 10th to present their offer of proof in writing, and the cause was passed to July 10th for further argument. On July 10th protestants filed their written offer of proof and further argument was heard. Thereupon on request of counsel for protestants the cause was passed for further argument to July 17, 1950.

To our mind this demonstrates that all persons desiring to protest this bond issue had ample time and opportunity to do so and that these protestants in particular were accorded ample time and opportunity to present their protest and were fully heard thereon.

In Oklahoma Turnpike Authority v. District Court of Lincoln County, 203 Okla. 330, 222 P. 2d 514, we held in paragraph two of the syllabus as follows:

"Notice of the hearing upon an application for the approval of bonds to be issued by the Oklahoma Turnpike Authority published in a newspaper of general circulation in the state as provided by 69 O. S. Supp. 1947 §668, constitutes due and proper notice of such proceeding, and is not violative of the due process clause of the Constitution."

In North Laramie Land Co. v. Hoffman, 268 U. S. 276, 45 S. Ct. 491, the Supreme Court of the United States held that a notice provided in state statute to sustain a judicial hearing was a matter of state concern and did not violate the provisions of the Fourteenth Amendment to the Constitution of the United States.

We also point out the the Supreme Court of the United States has conclusively held that a bond validation proceeding, whether it be by a state official or a court of the state, is a proceeding to secure evidence of the legality of the issuance of the bonds, and is governed by state law rather than any provision in the Constitution of the United States. See Tregea v. Board of Directors of Modesto Irrigation District, 164 U. S. 179, 17 S. Ct. 52.

Seventeenth Question: Does the Turnpike Act violate a' contract between the State of Oklahoma and Lincoln county?

The material facts here relied upon are that in 1927 Lincoln county voted road bonds in the sum of $1,200,000 and thereupon furnished $900,000 to the State Highway Commission, which sum was used, with various other state and federal funds, to construct and complete a paved road entirely across Lincoln county and passing through Chandler, the county seat of that county, which paved road was a part of the highway from Oklahoma City to Tulsa, and a part of Highway 66. The state has ever since maintained this paved highway, not only through Lincoln county, but in all the length thereof. It seems to be the theory of the protestants that this construction in 1927 created a contractual obligation upon the state that it would never construct or have any part in the construction of any other highway that would take traffic between Oklahoma City and Tulsa away from this highway so constructed in 1927. It is shown that in 1927 there was complete understanding between the then county commissioners of Lincoln county and the then State Highway Commissioners of Oklahoma as to the manner in which this bond money was to be used, and it is shown that it was so used. There is nothing to indicate that there was any intention on the part of the then Highway Commissioners to create any such obligation as is here urged and relied upon by protestants. We are passing by the question whether the then Highway Commissioners had the right or authority to create any such perpetual obligation on the state, and we mean not the slightest indication that they did have or might have had authority to make any such contract of perpetual duration. This toll road running between Oklahoma City and Tulsa passes across Lincoln county and near to but not through the cities of Chandler and Stroud in Lincoln county, and in handling traffic between Tulsa and Oklahoma City it will take traffic from Highway 66 which runs through Chandler and Stroud, as regards those travelers who prefer to pay toll rather than to travel the free road.

It is estimated this toll road will service 67 1/2 per cent of the traffic now passing over Highway 66 through Chandler and Stroud. The amount may be more or less than that figure, but, in any event, the passage of the Turnpike Act and the completing of the toll road does not violate any contract made by the state expressly or impliedly, because no such contract was made (without implying that any one had authority to make such contract). As to the understanding actually had in 1927, there is no indication that the state had breached any part of it. As to the obligation of the State Highway Commission in reference to this Lincoln county bond issue, this court passed on that in Wentz v. Ingenthorn, 146 Okla. 165, 294 P. 154, and in Wentz v. Board of County Com'rs of Lincoln County, 147 Okla. 173, 295 P. 599. There is nothing to indicate that the state will not continue to fully maintain the free road service now furnished the

traffic on Highway 66 through Chandler and Stroud. We answer the seventeenth question in the negative.

Eighteenth Question: Is the notice of sale of bonds fatally defective because it limits bids to one-fourth of one per cent interest rates upon separate maturities and restricts bids to the extent of requiring that each bid shall cover the entire issue of $31,000,000?

It is true the Turnpike Act, in sec. 9, 69 O. S. Supp. 1949 §659, requires that the bonds be sold to the bidder who bids the lowest rate of interest, and that the bond issue shall bear interest at a rate not to exceed 4 per cent. But there is no requirement in the Act that the bonds should be sold by piecemeal or in job lots less than the whole amount of the issue, nor is there any provision in the Act as to whether the interest rates bid upon separate maturities should be broken at 1/2, 1/4, 1/8, or any part or portion of one per cent. It would seem to us that it was essential that the Authority sell all of the bond issue and it would seem that practical matters or matters of practical consideration would dictate as to fixing the breaking point of the fraction of one per cent in the interest rates. In oral argument the protestants urged that the interest rate should not have been broken at any percentage point, and in any event not broken at a higher figure than 1/8th of one per cent. Be that as it may, the Authority in its discretion fixed the breaking point at 1/4th of one per cent. The notice of sale as thus given resulted in several bids and in the sale at the lowest interest rate bid for the bond issue, which was less than 4 per cent. This constituted a substantial compliance with the Act, and we answer this question in the negative.

Nineteenth Question: Does the Turnpike Authority have a legally selected secretary and treasurer?

It is contended by protestants that the person who has been selected as secretary and treasurer and who has been so acting, cannot act in such joint capacity; but that there must be one person for secretary and another for treasurer. On original organization in 1947 the Authority selected Mr. Paul Wilson as treasurer, and Mr. Joe R. Jarboe as secretary. On June 13, 1950, Mr. Jarboe resigned as secretary and the Authority ordered consolidation of the offices of secretary and treasurer and selected Mr. Wilson as secretary and treasurer. The original by-laws of the Authority had provided "The same person may, but need not be, both secretary and treasurer."

On June 14, 1950, the by-laws were amended by unanimous vote to require the consolidation of these two offices.

We see no reason why the Authority could not so conduct its business, although the matter of change in by-laws was not specifically mentioned in the call for the meeting on June 13th, nor in the minutes when they recessed or adjourned that meeting until June 14th. So far as we can see this is a matter of internal operation of the Authority with little or no importance to the question before us, but we have discussed it since it was so expressly presented and urged. It does not appear that the original by-laws needed any amendment to justify or validate the consolidation of the two offices in one person. We conclude the Authority does have a legal secretary and treasurer.

In addition to the matters heretofore discussed the protestants have specifically offered proof on many items of detail. Applicants contend they are not material to the matters presented by the application and protest. We here undertake to list these several items by brief reference.

The protestants offer to prove that U. S. Highway 66 is known as the "Main Street of America," is the most heavily traveled and the best known of all transcontinental highways, and in fact is the only highway of which, by its number, a song has been written and widely publicized and is in affectionate general use; that the last

"open gap" on Highway 66 was paved with monies in part furnished by the Lincoln county bond issue in 1927; that there are outstanding and unpaid bonds of that issue to the extent of about 20 per cent thereof; that Creek county, Oklahoma, since 1924, has made a contribution of several hundred thousand dollars to the paving of Highway 66 between Oklahoma City and Tulsa; that the United States Government, through the Bureau of Public Roads, has heretofore contributed thereto a total of about $1,500,000 since U. S. Highway 66 markers have been placed thereon; that since 1927 the State of Oklahoma has at all times maintained Highway 66 between Oklahoma City and Tulsa; that when the proposed toll road is completed it could be so operated that at one end thereof a motorist might drive 37 miles on Highway 66 before encountering the first toll booth; that a motorist traveling west from Tulsa would arrive at a point six miles from the business section of Tulsa whereupon he would face the alternative of proceeding on a two-lane free highway marked U. S. 66 to Sapulpa, or to take the four-lane divided toll highway; that there will not be proper indication markers at or near the entrance to the toll road to distinguish it from the adjacent free road, to the distress of travelers; that federal aid is presently applied for in a large sum to connect the termini of this toll road with U. S. Highway 66; that a substantial portion of the costs of the last mentioned construction is planned to be contributed by the State Highway Department; that the interests of the protestants are correctly shown in the protest; that the Turnpike Authority proposed to close certain public roads to the detriment and damage of protestants and other property owners which will also handicap the operation of school buses and mail routes; that the construction of this toll road will require the construction, repair and maintenance of extra roads thereby creating extra obligations on protestants; that the construction of such toll road will cause flood water damage; that the Authority has contracted for advance surveys without present available funds; that "diamond" toll road intersections are inferior to "cloverleaf" intersections which latter construction will or may hereafter be constructed at great additional cost; that in order to keep in touch with the filing of this proceeding for approval of this bond issue the protestants were required, or deemed it necessary, to take protective measures, such as to subscribe for clipping service and to subscribe to a named daily newspaper and to diligently search each issue of certain named daily newspapers and to request letters of advice from the Turnpike Authority; that protestants, in advance of the 6th day of July, 1950, requested this court in conference to outline methods of filing pleadings and presentation of evidence and argument; that in the judgment of attorneys for protestants the times allowed by the court for the various presentations herein were insufficient; that protestants were not permitted to present their protest in the manner provided for trial of civil cases in the trial courts of the state; that other highways in the state carried heavier traffic than was carried by Highway 66 at Chandler; that two outstanding firms of engineers thought this toll road project not feasible or practicable; that the Reconstruction Finance Corporation declined to buy these bonds; that this toll road will divert at least 67 per cent of the traffic on Highway 66; certain alleged details as to toll road construction in other states in relation to federal highways there; that toll roads are an anachronism to be tolerated only under certain circumstances; that in one other state the construction of such a toll road has resulted in neglect of federal highways between cities served by the toll road; that this toll road will be so operated as to take motorists a long distance into the toll road before they encounter toll booths and discover that they are on a toll road; certain additional details as to the financing of construction of the

Pennsylvania Turnpike; that the Pennsylvania Turnpike does not run from Pittsburgh to Harrisburg, but starts 18 miles from Harrisburg and ends 12 miles from Pittsburgh; that there are certain stated future plans for detail construction at each end of the Pennsylvania Turnpike; that the people of Pennsylvania do not want any more toll roads, but want more and better free roads.

It is at once apparent that many of these items are not material to the questions before us and that several of said items are based upon speculation, conjecture, opinions, and apprehensions. Some of these items are based upon matters of record or historical knowledge. Several of these items are admitted to be true in fact by the Authority, however, without admitting that they are of any materiality.

Upon the whole, we conclude that these several items offered to be proven are immaterial, and the offer to introduce evidence thereon is denied, and these facts are not considered by this court, except to the extent of those items which have been heretofore discussed in detail in this opinion.

For the reasons stated, it is apparent, and we find that protestants have had ample opportunity to present their objections and protest to the approval of this bond issue, and that neither the protest as a whole nor any item thereof can be sustained. Therefore the protest and each item thereof is denied.

And upon full hearing, due consideration, and final determination, the court finds that the Oklahoma Turnpike Authority was legally created with valid delegation of power to carry out and perform its duties, including the issuance and sale of bonds to be retired out of proceeds of the operation of a toll road, and that in all things the proposed bond issue was legally and properly authorized; and it is found and held that legal and valid notice of this application was given, that the applicant and all protestants were fully heard and their grounds of protest considered, and the court adjudges that it is satisfied that the Turnpike revenue bonds here involved have been properly authorized in accordance with the act above cited, and that when issued the aforesaid bonds of the Oklahoma Turnpike Authority will constitute valid obligations in accordance with their terms, and therefore the court, by this opinion, approves this issuance of these bonds, as it is authorized and required to do by the Act above cited.

The court hereby fixes a period of five days within which a petition for rehearing may be filed herein.

DAVISON, C. J., ARNOLD, V. C. J., and CORN, LUTTRELL, HALLEY, JOHNSON, and O'NEAL, JJ., concur. GIBSON, J., dissents.

———

ARNOLD, V.C.J. (Special views on Question 12.) In view of the dissent of Mr. Justice Gibson I feel I should point out more specifically that the Turnpike Act provides that the Authority shall "construct, maintain, repair and operate the turnpike project and highway which with its access road construction and connections shall extend between the cities of Tulsa and Oklahoma City . . ." This provision contemplates continuous highway facilities by turnpike and access roads from Oklahoma City to Tulsa but it does not contemplate that the Turnpike Authortiy shall necessarily build access roads from termini to city limits nor does it contemplate that the turnpike road shall necessarily extend to the city limits. If the turnpike connects with access roads which extend it into the terminal cities, and this is the case in each instance here under the proposed plan of construction, there can be no objection to the determination of the Authority to fix the termini of the turnpike short of the city limits of Oklahoma City and Tulsa.

GIBSON, J. (dissenting). Since is it charged by the protestants and admitted by the Turnpike Authority that the toll road to be constructed with the proceeds of the bond issue will not extend throughout the distance between Oklahoma City and the city of Tulsa, the termini prescribed by the Act, and that the Authority will not at its expense provide said cities with access thereto, I am of the opinion that for that reason alone, even if there were no others, approval of the bonds should be withheld.