IN THE MATTER OF APPLICATION OF THE OKLA. DEVELOPMENT FINANCE AUTHORITY
2022 OK 41
Case Number: 120106
Decided: 05/03/2022
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2022 OK 41, __ P.3d __

 

 

IN THE MATTER OF THE APPLICATION OF THE OKLAHOMA DEVELOPMENT FINANCE AUTHORITY FOR APPROVAL OF NOT TO EXCEED $800,000,000 RATEPAYER-BACKED BONDS (OKLAHOMA GAS AND ELECTRIC COMPANY), SERIES 2022 (FEDERALLY TAXABLE)

ORIGINAL ACTION TO APPROVE RATEPAYER-BACKED BONDS

¶0 The Oklahoma Development Finance Authority requested that this Court assume original jurisdiction and approve the issuance of ratepayer-backed bonds pursuant to the February 2021 Regulated Utility Consumer Protection Act, 74 O.S.2021, ch. 110A-1, §§ 9070-9081. The Oklahoma Development Finance Authority seeks to issue bonds to cover the debt incurred by Oklahoma Gas and Electric Company from unprecedented fuel costs during the February 2021 winter weather event. Oklahoma Gas and Electric Company's ratepayers would then fund the bond payments through a monthly charge. The ratepayer-backed bonds would allow customers to pay their utility bills at a lower amount over a longer period of time. Protestors challenged the proposed bonds on several grounds, focusing on the constitutionality of the bonds. We assume original jurisdiction and hold the ratepayer-backed bonds were properly authorized under the Act and are constitutional.

ORIGINAL JURISDICTION ASSUMED;
PROPOSED BOND ISSUE APPROVED.

Jered T. Davidson, The Public Finance Law Group, PLLC, Oklahoma City Oklahoma, for The Oklahoma Development Finance Authority.

John Case, Oklahoma City, Oklahoma, Pro Se Opponent.

Mike Reynolds, Oklahoma City, Oklahoma, Pro Se Opponent.

Porter Davis, Oklahoma City, Oklahoma, Pro Se Opponent.

Thomas Austin, Nichols Hills, Oklahoma, Pro Se Opponent.

James Pickel, Oklahoma City, Oklahoma, Pro Se Opponent.

Gail and Larry Foster, Edmond, Oklahoma, Pro Se Opponents.

Deborah Shinn, Oklahoma City, Oklahoma, Pro Se Opponent.

Maureen Harvey, Choctaw, Oklahoma, Pro Se Opponent.

Clare Auwarter, Oklahoma City, Oklahoma, Pro Se Opponent.

Suzanne Broadbent, Oklahoma City, Oklahoma, Pro Se Opponent.

Steven Goldman, The Village, Oklahoma, Pro Se Opponent

Stephen A. Melsh, Oklahoma City, Oklahoma, Pro Se Opponent.

Laura Rice, Oklahoma City, Oklahoma, Pro Se Opponent.

Barbara Gallivan, Oklahoma City, Oklahoma, Pro Se Opponent.

Roy Diehl, Oklahoma City, Oklahoma, Pro Se Opponent.

PER CURIAM:

¶1 The matter before us is an original proceeding brought pursuant to the February 2021 Regulated Utility Consumer Protection Act (Act), specifically 74 O.S.2021, ch. 110A-1, § 9079, https://govt.westlaw.com/okjc (in ch. 110A-1, follow hyperlink titled, "February 2021 Regulated Utility Consumer Protection Act"), which authorized the Oklahoma Development Finance Authority (ODFA) to file an application with this Court seeking approval of ratepayer-backed bonds to finance the recovery of the fuel costs incurred by Oklahoma Gas and Electric Company (OG&E) during the February 2021 weather event. We assume original jurisdiction and approve the bonds.

BACKGROUND AND PROCEDURAL HISTORY

¶2 In February 2021, the State of Oklahoma endured record cold temperatures. The severe cold weather resulted in a shortage of the natural gas supply and in turn extraordinary natural gas costs for regulated utilities operating in Oklahoma. The cost of natural gas for the Oklahoma utilities during the two weeks of extreme cold exceeded their entire fuel acquisition cost in 2020. As a result, the Oklahoma Legislature enacted the Act, 74 O.S.2021, ch. 110A-1, §§ 9070-9081, to provide financing options to lower the economic impact on the utility customers. Most Oklahomans could not afford a one-time, cost recovery payment imposed by the utility, and the Legislature provided a new mechanism to spread the fuel cost recovery over a longer period to minimize the financial impact on utility customers. The Act authorized the Oklahoma Corporation Commission (Commission) to approve the recovery of costs through securitization, which is a financial tool creating a property right to revenues collected by a regulated utility from customers under an irrevocable and nonbypassable mechanism. 74 O.S.2021, ch. 110A-1, § 9072(10), https://govt.westlaw.com/okjc. The property right is then sold and used as security for the repayment of the ratepayer-backed bonds. Id.

¶3 The Act is important because OG&E is an investor-owned electric public utility subject to regulatory oversight concerning its retail rates and charges for sales of electricity made within Oklahoma. Unlike a normal corporation, OG&E cannot increase utility rates on its own. Instead, the Commission must approve all rates and fuel costs adjustments. In this case, the Legislature set out the framework for securitization through the Act., but the Commission had to approve any rate increase to recover the fuel costs incurred during the February 2021 weather event.

¶4 The Act sets up a bifurcated process. First, regulated utilities file an application with the Commission to evaluate the "extreme purchase costs, extraordinary costs or both, requested for recovery which may be mitigated through securitization to reduce the utility bill impact on customers." 74 O.S.2021, ch. 110A-1, § 9073(A), https://govt.westlaw.com/okjc. The Commission must determine whether the expenses recoverable from customers were fair, just, reasonable, and prudently incurred. 74 O.S.2021, ch. 110A-1, § 9073, https://govt.westlaw.com/okjc. If the Commission approves the expenses, the Act authorizes the Commission to adopt a financing order allowing the utilities to recover their costs. Second in the process, the Act permits ODFAId.

¶5 On April 1, 2021, OG&E applied with the Commission to determine that the $838 million in fuel costs OG&E incurred during the February 2021 winter storm were prudent. OG&E, the Commission's Public Utility Division, the Oklahoma Attorney General's office, and other large stakeholders (including the American Association of Retired Persons (AARP), Walmart, and Oklahoma Industrial Energy Consumers) entered into settlement negotiations regarding OG&E's application. All the parties, except for AARP and the Attorney General, entered into a Settlement Agreement that found OG&E prudently incurred costs during the winter storm amounting to $739 million.

¶6 In October 2021, an Administrative Law Judge (ALJ) for the Commission held a hearing on the Settlement Agreement, wherein all parties presented evidence either in support or against the Agreement. However, all parties agreed that securitization was the most appropriate method for OG&E to finance the recovery costs. The ALJ issued a report approving the Settlement Agreement.

¶7 The Commission then held a hearing regarding the ALJ's report and issued the Final Financing Order on December 16, 2021. The Order approved $739 million in costs incurred by OG&E to be collected through securitization of that debt. The Order specified that ODFA would purchase the debt through issuing bonds backed by a monthly charge (WES charge) assessed to each OG&E ratepayer. The securities were to be amortized for a longer period of time (not to exceed 28 years) to lower the ratepayer collection cost. Under the securitization method, the monthly WES charge was estimated to be $2.12 for an average residential customer. Id.

¶8 ODFA filed an application with this Court to assume original jurisdiction for approval of the ratepayer-backed bonds, per the provisions of 74 O.S.2021, ch. 110A-1, § 9079, https://govt.westlaw.com/okjc. Fifteen Protestants filed in response to the application and challenge the bonds on several grounds but focus primarily on the constitutionality of the bonds. The questions before this Court are (1) whether the ratepayer-backed bonds were properly authorized under the Act and (2) whether the bonds are constitutional. We answer both in the affirmative. The authorization of the ratepayer-backed bonds properly followed the Act, and the bonds are self-liquidating and therefore constitutional.

STANDARD OF REVIEW

¶9 The Court has long recognized that its obligation in reviewing bonds is to determine whether the bonds facially violate the law and to examine the legal authority presented by protestants. In re Application of Okla. Turnpike Auth., 2018 OK 88431 P.3d 59In re Application of Okla. Capitol Improvement Auth., 1998 OK 25, ¶ 8, 958 P.2d 759, 763. If two possible interpretations of a statute are possible, only one of which would render it unconstitutional, a court is bound to give the statute an interpretation that will render it constitutional unless constitutional infirmity is shown beyond a reasonable doubt. Fent v. Okla. Capitol Improvement Auth., 1999 OK 64984 P.2d 200

DISCUSSION

¶10 The Legislature conferred upon the Court "exclusive original jurisdiction" to hear and determine ODFA's application. 74 O.S.2021, ch. 110A-1, § 9079, https://govt.westlaw.com/okjc. ODFA gave proper notice of its application and the hearing as required by § 9079, as attested by its proof of publication filed with the Court. Id. The Court's exclusive original jurisdiction entails:

If the Court shall be satisfied that the bonds or any portions thereof have been properly authorized in accordance with this act and the Constitution of the State of Oklahoma, and that when issued they will constitute valid obligations in accordance with their terms, the Court shall render its written opinion approving the ratepayer-backed bonds and shall fix the time within which a petition for rehearing may be filed. The decision of the Court shall be a judicial determination of the validity of the bonds, shall be conclusive as to the Authority, the state, its officers, agents and instrumentalities, and all other persons, and thereafter the bonds so approved and the revenues pledged to their payment shall be incontestable in any court in this state.

74 O.S.2021, ch. 110A-1, § 9079, https://govt.westlaw.com/okjc.

¶11 The Legislature enacted this Act to provide for the issuance of ratepayer-backed bonds to regulated entities like OG&E to allow those entities to recover the fuel costs incurred in the February 2021 weather event passed to their customers and thereby to allow customers to pay those costs at a lower amount over a longer period. 74 O.S.2021, ch. 110A-1, § 9071, https://govt.westlaw.com/okjc. Prior to the Act, OG&E had two options for passing the fuel costs to their customers: (1) recoup the cost over the remaining balance of the current year through its current fuel cost adjustment rider, or (2) create a regulatory asset, subject to the same cost of capital analysis as its standard tariff rates. See Oklahoma Gas and Electric Company (Estimate Comparisons), supra note 4. Securitization approved by the Act and the Commission provided a middle ground, allowing the payment of fuel costs over a longer period but at a lower cost of capital than traditional utility financing. Although this is the first time the Legislature allowed the use of securitization for bonds, the method permitted ODFA to access municipal bond markets (with lower interest rates) instead of the regulated utilities' normal bond markets. In turn, securitization will provide OG&E's customers with the lowest monthly payment. Id.

¶12 Here, the ratepayer-backed bonds conform to the law, and the Final Financing Order sets out the parameters of the bonds' issuance, terms, conditions, requirements, and interest. 74 O.S.2021, ch. 110A-1, § 9074(A), https://govt.westlaw.com/okjc. The process set out in the Act was followed, and the bonds appear facially valid. Protestants provide no authority to the contrary, nor do Protestants even allege that the statutory process was not followed here.

¶13 Instead, many Protestants raise issues with securitization itself and question what entities are profiting from the bonds (in carrying and servicing costs). However, it is "firmly recognized that it is not the place of this Court, or any court, to concern itself with a statute's propriety, desirability, wisdom, or its practicality as a working proposition." Fent, 1999 OK 64Okla. Indus. Auth. v. Barnes, 1988 OK 98769 P.2d 115Fent, 1999 OK 64

It is not this Court's prerogative to question the sagacity of the expressed policy. Whether an act is wise or unwise, whether it is based on sound economic theory or whether it is the best means to achieve the desired result are matters for legislative determination.

In re Application of Okla. Capitol Improvement, 1998 OK 25Id. Instead, the Court is to determine whether the authorization of the bonds followed the statutory process, and we hold the process to authorize the ratepayer-backed bonds was correctly followed.

¶14 Protestants further contend that the bonds are unconstitutional, in violation of Oklahoma's balanced budget amendments, Oklahoma Constitution Article X, § 23In re Application of Okla. Capitol Improvement, 1998 OK 25

¶15 This Court has approved bonds that financed the acquisition or construction of self-liquidating projects. That kind of obligation did not create a debt because the bonds issued were retired solely from revenues derived from the project itself.Fent, 1999 OK 64 In re Application of Oklahoma Turnpike Authority, 1950 OK 208221 P.2d 795Id. Here, the ratepayer-backed bonds will be repaid with a secure revenue source, through a WES charge on each ratepayer's monthly bill. The money to directly pay the bonds is reliable, predictable fees from "outside" sources--rather than from one state entity to the other.

¶16 Even more, the Act specifically provides that the ratepayer-backed bonds shall not at any time be deemed to constitute a debt of the State or ODFA, and it requires that the bonds contain on their face a statement that neither the full faith and credit nor the taxing power of the state is pledged for the payment of the principal and interest of the bonds. See In re Application of Okla. Capitol Improvement Auth., 1998 OK 25958 P.2d 759stare decisis demands their approval. Id. ¶¶ 45-46, 958 P.2d at 773.

¶17 Protestants also raise issues involving the examination of the Commission's Final Financing Order. The Act provided that the Commission's financing order is appealable. 74 O.S.2021, ch. 110A-1, § 9074(F), https://govt.westlaw.com/okjc. Yet no party appealed. The record regarding the approval of the Final Financing Order is not before the Court, and the financing order is therefore final. See State ex rel. Comm'rs Land Office v. Corp. Comm'n, 1979 OK 16590 P.2d 674

CONCLUSION

¶18 The February 2021 Regulated Utility Consumer Protection Act provides that if the Court is satisfied that the obligations have been properly authorized in accordance with the Act and the Oklahoma Constitution and the bonds constitute valid obligations in accordance with their terms, the Court shall render its written opinion approving the ratepayer-backed bonds. 74 O.S.2021, ch. 110A-1, § 9079, https://govt.westlaw.com/okjc. Accordingly, we approve the ratepayer-backed bonds. Any petition for rehearing regarding this matter shall be filed within twenty (20) days of the date of this opinion.

ORIGINAL JURISDICTION ASSUMED;
PROPOSED BOND ISSUE APPROVED.

Darby, C.J., Kane, V.C.J., Kauger, Winchester, Edmondson, Combs (by separate writing), Gurich, and Rowe (by separate writing), J.J., concur.

Kane, V.C.J., concurring:

"While the bonds are facially valid, I write separately to reemphasize that this Court is not authorized to delve into the fiscal policy choices of the Legislature."

Kuehn, J., recused.

FOOTNOTES

74 O.S.2021, ch. 70, § 5062.8

 
 
 
 Description of Issue
 
 
 FCA*(w/o Reg. Asset**)
 
 
 FCA Recovery

 Tariff***
 
 
 10-Year Treasury Rate
 
 
 Traditional
 
 
 Securitization
 
 
 
 
 Amortization Period
 
 
 1 month
 
 
 1 year
 
 
 4 years
 
 
 28 years
 
 
 28 years
 
 
 
 
 Interest Rate
 
 
 0.12%
 
 
 0.12%
 
 
 1.44%
 
 
 9.017%

 (WACC****)
 
 
 2.58%
 
 
 
 
 Principal Amount Owed
 
 
 $748,965,481
 
 
 $748,965,481
 
 
 $748,965,481
 
 
 $748,965,481
 
 
 $760,000,000
 
 
 
 
 Total Interest Accrued
 
 
 $74,897
 
 
 $486,917
 
 
 $22,195,277
 
 
 $1,317,908,420
 
 
 $307,259,833
 
 
 
 
 Total Amount
 
 
 $749,040,378
 
 
 $749,452,398
 
 
 $771,160,758
 
 
 $2,066,873,901
 
 
 $1,067,259,833
 
 
 
 
 Monthly Impact to Customer
 
 
 $454.14 (one-time payment)
 
 
 $40.14
 
 
 $10.32
 
 
 $3.95
 
 
 $2.12
 
 
 

* FCA = Fuel Cost Adjustment
** Regulatory Asset = A holding place from storm costs, which are carried on the utility's books (Carrying charge is .628%).
*** FCA Recovery Tariff = When the over-or-under collected fuel balance is greater than $50 Million, OG&E can make an adjustment to collect or credit the difference between the fuel cost collected in the tariffs and the actual fuel expense incurred.
**** WACC = Weighted Average Cost of Capital

See Oklahoma Corporation Commission, Media Advisory, Commission Approves order on OG&E's February Fuel Costs, December 16, 2021, available at https://content.govdelivery.com/attachments/OKOCC/2021/12/16/file_attachments/2025304/2021-12-16-occ-media-advisory-oge-february-fuel-costs.pdf.

The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid, except as may be provided in this section and in Sections 24 and 25 of Article X of the Constitution of the State of Oklahoma.

Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized by law for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election. On the final passage of such bill in either House of the Legislature, the question shall be taken by yeas and nays, to be duly entered on the journals thereof, and shall be: "Shall this bill pass, and ought the same to receive the sanction of the people?

In re Application of Okla. Turnpike Auth., 2018 OK 88431 P.3d 59In re Application of Okla. Dev. Fin. Auth., 2013 OK 74In re Application of Okla. Dev. Fin. Auth., 2004 OK 2689 P.3d 1075Fent, 1999 OK 64984 P.2d 200In re Application of Okla. Capitol Improvement Auth., 1998 OK 25958 P.2d 759In re Application of Okla. Capitol Improvement Auth., 1966 OK 6410 P.2d 46Application of Okla. Capitol Improvement Auth., 1960 OK 207355 P.2d 1028In re Application of Okla. Turnpike Auth., 1950 OK 208221 P.2d 795In re Application of Bd. of Regents for Okla. Agric. & Mech. Colls., 1946 OK 110167 P.2d 883In re Application of Bd. of Regents of Univ. of Okla., 1945 OK 224161 P.2d 447Baker v. Carter, 1933 OK 48425 P.2d 747

 

 

COMBS, J., with whom GURICH, J., joins, concurring specially:

¶1 I concur in this Court's limited judgment that "[t]he process set out in the [February 2021 Regulated Utility Consumer Protection] Act[, 74 O.S.2021, §§ 9070

¶2 In section 9079 of the Act, the Legislature conferred "exclusive original jurisdiction" upon this Court to "hear and determine" the Oklahoma Development Finance Authority's "application . . . for the approval of ratepayer-backed bonds issued under this [A]ct" and to "consider and pass upon the application and any protests which may be filed against such application as speedily as possible." 74 O.S.2021, § 9079that the bonds or any portions thereof have been properly authorized in accordance with this [A]ct and the Constitution of the State of Oklahoma, and that when issued they will constitute valid obligations in accordance with their terms." Id. (emphasis added). But the Act fails to shed further light on what the phrase "properly authorized in accordance with this [A]ct" means.

¶3 For instance, should this Court's inquiry into proper authorization consider whether the Oklahoma Corporation Commission properly "determine[d] that the amounts [of extreme purchase costs and extraordinary costs] incurred would otherwise be recoverable from customers as fair, just and reasonable expenses and prudently incurred"? See id. § 9073(E). Our opinion suggests such considerations should not be entertained unless the Corporation Commission's financing order is appealed--something which appears to be permitted under section 9074(F) of the Act,See Majority Op. ¶¶ 13, 17. That certainly is one interpretation--perhaps the best interpretation--of the language in section 9079. Yet the numerous Protestants in this matter urge us to interpret the language of section 9079 more expansively so that we can consider (among other "merits" issues) whether the extraordinary costs associated with the extreme cold in February of 2021 were fair, just, reasonable, and prudently incurred.

¶4 I am somewhat troubled by our opinion's outright dismissal of Protestants' arguments on the basis that they should have filed an appeal to present or to preserve such arguments. My frustrations stem from the ODFA attorney's revelation at the referee's hearing in this matter that OG&E would have asked any Protestant filing an appeal to post a $760,000,000 supersedeas bond pursuant to Section 21 of Article IX of the Oklahoma Constitution.see supra note 2, the prospect of having to post a nearly billion-dollar bond has a chilling effect on anyone deciding whether to file an appeal. Thus, for all practical purposes, this Court has been prevented from reaching the bulk of Protestants' arguments even though the language of section 9079 arguably doesn't stand in our way. I suppose my complaint ultimately lies with the Legislature. If it wanted to limit our review under section 9079 to be so perfunctory, the Legislature could have been more explicit in the language it enacted.

¶5 Of more grave concern to me, however, is the Attorney General's abdication of his duties to OG&E's consumers in this action. The Attorney General has a statutory duty "as the chief law officer of the state . . . [t]o represent and protect the collective interests of all utility consumers of this state in rate-related proceedings before the Corporation Commission." 74 O.S.2021, § 18b

¶6 While the case was pending before the ALJ and the Commission, the Attorney General chose not to take any position on the Settlement Agreement reached between OG&E and several of its largest consumers (e.g., Walmart and OIEC). In that Settlement Agreement, OG&E agreed to decrease the amount of extraordinary costs it would seek to recover by $99 million in exchange for a concession from the large stakeholders that such compromised amount was just, fair, reasonable, and prudently incurred. The Attorney General neither subscribed to the Settlement Agreement nor joined the other nonsignatory, the AARP, in submitting exceptions to the ALJ's Report and Recommendation approving the Settlement Agreement. See Majority Op. ¶¶ 5--6 & nn.2--3. Thus, he never took any position on what amount of OG&E's extraordinary costs were fair, just, reasonable, or prudently incurred. He also failed to litigate other legitimate points raised by Protestants. Rather, he chose to support securitization in the abstract, contending that securitization of any amount would save OG&E's consumers money. Had he litigated the amount of OG&E's extraordinary costs, he would have likely saved those consumers even more money and, better yet, would have engaged the adversarial process so as to reach a more just result.

¶7 The Attorney General's desire not to press those issues before the Corporation Commission naturally translated into his failure to file an appeal with this Court. Of all people, the Attorney General would have been the best party to file such an appeal, particularly insofar as he arguably doesn't have to post the nearly billion-dollar supersedeas bond that other Protestants would. See 12 O.S.2021, § 66

¶8 After the ODFA initiated this original action by filing its application for the approval of bonds in December of 2021, the Attorney General did not file any appearance within the first two months. So this Court gave him an opportunity to intervene and asked for his response by no later than March 1, 2022. See Order 1, Feb. 16, 2022. On that date, the Attorney General filed a Notice of Non-Intervention, indicating his belief that he had already fulfilled his statutory duty to represent the utility consumers in rate-related proceedings before the Corporation Commission and that counsel for the ODFA had adequately briefed the issues in this bond-related proceeding. See Notice of Non-Intervention of Att'y Gen. 1--2, Mar. 1, 2022. Consequently, he "ha[d] nothing substantial to add" and did not want to delay these proceedings further because of his concerns that interest rates on the bonds are likely to increase. Id.

¶9 The utility consumers that the Attorney General should be representing have effectively been left without representation. Their access to counsel lies with the Attorney General. Yet he has failed them. The lack of meaningful participation at the settlement stage, the failure to file an appeal of the Corporation Commission's financing order, and the decision not to intervene in this proceeding leaves this Court with no input from the utility consumers' statutorily appointed counsel and with few options when it comes to reviewing the ODFA's application to approve the bonds. Thus, despite my reservations, the record before us leads me to concur in the limited holdings contained in our opinion.

FOOTNOTES

74 O.S.2021, § 9074See generally Okla. Const. art. IX, § 20 (discussing the general rule for appeals from the Corporation Commission); Okla. Admin. Code § 165:5-17-1 (discussing the general rule for post-order relief--i.e., motions for rehearing--and setting a 10-day deadline for the filing of such motions but otherwise failing to specify any hard deadline for concluding the hearing on such motions).

 

 

ROWE, J., with whom GURICH, J., joins, concurring:

¶1 I concur in the Court's judgment insofar as I do not recognize any clear constitutional or legal infirmities in Petitioner's application. I write separately to address once more a number of concerns I have with the nature of these proceedings. This is now the second time in a matter of weeks that this Court has been prompted by virtue of legislative enactments to preemptively "approve" the issuance of hundreds of millions of dollars in government-backed bonds, comprising debts that will be born in whole by the people of Oklahoma.

¶2 This is particularly troubling in light of legitimate questions raised by the Protestors in this matter. From a procedural standpoint, Protestor Porter H. Davis takes issue with the Attorney General's Notice of Non-Intervention, noting that the Attorney General has an obligation to "appear for the state and defend all actions and proceedings..." 74 O.S. § 18b

¶3 Regardless of the legitimacy of these protests, this Court has long recognized that our obligation in reviewing bonds is to determine whether they facially violate the law. In re Application of Okla. Turnpike Auth., 2018 OK 88431 P.3d 59

¶4 Upon review, the questions above and most others raised by the Protesters, relate to the Corporation Commission's Final Financing Order, including the settlement agreement and whether OG&E prudently incurred its fuel cost. These issues constitute matters of public policy, which fall exclusively within the purview of the Legislature and the Corporation Commission and go beyond the scope of our review.

¶5 I must say, however, I find it hard to reconcile that our statutorily-mandated pre-approval of the bonds in this matter--which cannot touch on substantive questions raised by the Protestors--serves to foreclose the right of these individuals and others in the future to challenge the legitimacy of the bonds or to raise any other valid legal issue. These consequences should not be taken lightly when the effect of our ruling will be to irrevocably saddle many Oklahomans with a significant financial obligation for the next twenty-eight years--and to establish additional precedent for future bond approvals.

¶6 The February 2021 Regulated Utility Consumer Protection Act, which established the procedure forming the basis of this matter, was enacted by the Legislature and signed into law by the Governor in February 2021. Despite my misgivings, our statutory mandate under the Act is limited to ruling upon the constitutionality of the policy, not to supplant the policy with our own.

FOOTNOTES

In re Application of the Oklahoma Capitol Improvement Authority, 2022 OK 31

If the Court shall be satisfied that the bonds or any portions thereof have been properly authorized in accordance with this act and the Constitution of the State of Oklahoma, and that when issued they will constitute valid obligations in accordance with their terms, the Court shall render its written opinion approving the ratepayer-backed bonds and shall fix the time within which a petition for rehearing may be filed.

The cursory nature of our review is perhaps underscored by the Attorney General's Notice of Non-Intervention filed March 1, 2022, in which he states:

The difficult policy decisions faced by the [Corporation] Commission in Cause No. PUD 202100072 are not presented here for the Court's review. Instead, the Court is called upon to review the bonds proposed by the Oklahoma Development Finance Authority to determine their constitutional validity. Counsel for the Authority has ably briefed these questions, and the Attorney General would have nothing substantial to add.

(emphasis in original).

The decision of the Court shall be a judicial determination of the validity of the bonds, shall be conclusive as to the Authority, the state, its officers, agents and instrumentalities, and all other persons, and thereafter the bonds so approved and the revenues pledged to their payment shall be incontestable in any court in this state.

See In re App. of Okla. Dev. Fin. Auth. for Approval of $1,450,000,000 Ratepayer-Backed Bonds (Okla. Natural Gas Co.), No. 120,274 (Okla. Sup. Ct. 2022); In re App. of Okla. Dev. Fin. Auth. for Approval of $725,000,000 Ratepayer-Backed Bonds (Pub. Serv. Co. of Okla.), No. 120,275 (Okla. Sup. Ct. 2022); See In re App. of Okla. Dev. Fin. Auth. for Approval of $95,000,000 Ratepayer-Backed Bonds (Summit Utils. Okla), No. 120,276 (Okla. Sup. Ct. 2022). These applications combined with the one at issue in this case will constitute $3,070,000,000 in bonded indebtedness to be borne by Oklahomans. For reference, the State's budget for FY 2022 authorized approximately $9,060,000,000 in appropriations. See H.B. 2900, 58th Leg, 1st Sess. (Okla. 2021); Governor Stitt Signs FY 2022 State Budget Package into Law, https://oklahoma.gov/governor/newsroom/newsroom/2021/may/governor-stitt-signs-fy-2022-state-budget-package-into-law.html?msclkid=88d451f9c7df11eca4a990d86c0868cc (last modified Aug. 18, 2021).