IN THE MATTER OF THE APPLICATION OF THE OKLAHOMA TURNPIKE AUTHORITY
2023 OK 84
Case Number: 120619
Decided: 08/01/2023
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2023 OK 84, __ P.3d __

 

 

IN THE MATTER OF THE APPLICATION OF THE OKLAHOMA TURNPIKE AUTHORITY FOR APPROVAL OF NOT TO EXCEED $500,000,000 OKLAHOMA TURNPIKE SYSTEM SECOND SENIOR LIEN REVENUE BONDS, SERIES 2022

ORIGINAL ACTION TO APPROVE STATE REVENUE BONDS

¶0 The Oklahoma Turnpike Authority brought this original proceeding pursuant to 69 O.S.2021, § 1718

ORIGINAL JURISDICTION PREVIOUSLY ASSUMED; 
PROPOSED BOND ISSUE APPROVED.

Jana L. Knott, Bass Law, P.C., Oklahoma City, Oklahoma, for Petitioner.

Jered T. Davidson, The Public Finance Law Group, PLLC, Oklahoma City, Oklahoma, for Petitioner.

Robert E. Norman, Cheek & Falcone, PLLC, Oklahoma City, Oklahoma, for Protestants--Pike Off OTA.

Stanley M. Ward, Noble, Oklahoma, for Protestants--Litigants in Cleveland County Case No. CV-2022-1905.

Richard C. Labarthe, Labarthe & Tarasov, a Professional Association, Oklahoma City, Oklahoma, for Protestants--Litigants in Cleveland County Case No. CV-2022-1905.

Alexey Tarasov, Labarthe & Tarasov, a Professional Association, Norman, Oklahoma for Protestants--Litigants in Cleveland County Case No. CV-2022-1905.

Andrew W. Lester and John E. Dorman, Spencer Fane LLP, Oklahoma City, Oklahoma, for Protestant--City of Norman.

Elaine M. Dowling, Oklahoma City, Oklahoma for Protestants--R. Jon McKay and Jo Deaton McKay.

Winchester, J.

¶1 Petitioner Oklahoma Turnpike Authority (OTA) asks this Court to approve $500,000,000.00 in Oklahoma Turnpike System Second Senior Lien Revenue Bonds pursuant to 69 O.S.2021, § 1718

¶2 Protestants first invite the Court to inject itself into the route-making process for a new turnpike location in the vicinity of Norman. Protestants ask that we disapprove an extension and thus deny the proposed route approved by the OTA. For over 30 years, the Legislature has given the OTA discretion to select turnpike routes within the locations authorized by the Legislature. The Court has consistently honored the discretion given to the OTA by the Legislature and allowed the OTA to exercise its judgment as the OTA has the engineering expertise and traffic data to make these complex far-reaching decisions regarding turnpike routes. We uphold the authority given to the OTA to decide routes for turnpikes and conclude that the OTA has the legislative authority to construct the South Extension that conforms to the location generally described in 69 O.S.2021, § 1705

¶3 To hold otherwise would inject this Court into the OTA's decision-making process regarding proposed turnpike routes. The OTA contends the proposed components of the Loop and South Extension will meet the purposes of the OTA to better facilitate vehicular traffic and meet safety needs, as traffic counts have steadily increased for the last three decades. See 69 O.S.2021, § 1701

¶4 The Court would not only be deciding the validity of the bonds but also substituting the OTA's discretion with its own in choosing a route, which the Court has consistently refused to do. The Court--without technical expertise--would be required to perform a turn-by-turn analysis of every proposed turnpike route to determine if it falls within the very general turnpike locations described by the Legislature in 69 O.S.2021, § 1705

¶5 Striking down the proposed turnpikes would also affect the entire process of financing and constructing turnpike projects. Prior to the OTA seeking bond validation from this Court, the Legislature authorized the turnpike projects at issue, and the OTA hired engineering and design firms to determine the proposed routes. The OTA's Board of Directors approved these routes with the caveat that the proposed routes were still under design and subject to environmental studies. The OTA has been working with federal and state agencies and local governments in the development of the final design of the proposed turnpike routes. Striking the proposed routes at this juncture and not allowing the OTA to exercise its statutory discretion to determine routes that are feasible and economically sound would not only waste resources already spent but would also lead to additional litigation. For these reasons, this Court stands by the last 30 years of precedence, allowing the OTA the broad authority to determine routes within the locations authorized by the Legislature. The OTA also has the legislative authority under 69 O.S.2021, §§ 1705

BACKGROUND AND PROCEDURAL HISTORY

¶6 To effectively address the issues before us, we must first look at the Oklahoma Turnpike System (System) as a whole. The System currently consists of 11 turnpikes and approximately 632 miles of roadways. Construction for the turnpike projects began in 1950, and since that time, our Court has never disallowed a bond issuance of the OTA.

¶7 The components of the System at issue are over thirty years in the making:

Beginning in 1987, Governor Henry Bellmon and the Legislature aspired to construct new turnpike projects, including what is termed the Loop.

In 1988, the OTA sought validation of its bonds to construct the proposed turnpikes, including components of the Loop, and the Court approved the bonds. In re Application of Okla. Tpk. Auth., 1989 OK 21770 P.2d 16

In 1993, the Legislature authorized the South Extension. See 69 O.S. § 1705

In 2016, the OTA sought validation of its bonds for the Kilpatrick and Kickapoo components of the Loop, and the Court approved the bonds. In re Application of Okla. Tpk. Auth., 2016 OK 124389 P.3d 318

Over the last 33 years, the OTA has completed four components of the Loop and two components of the South Extension.

¶8 In early 2022, the OTA announced a set of new turnpikes and other projects to improve current turnpikes and their infrastructure, titling the project ACCESS

¶9 The issues in this case involve these last segments to connect and finalize the Loop (the Tri-City Connector and the East-West Connector) and the final segment of the South Extension. These final segments total approximately 35 miles.

¶10 The entirety of the ACCESS Oklahoma plan will use approximately $5 billion in bonds. During a special meeting on June 9, 2022, the OTA adopted a bond resolution, which authorized issuing the first phase of the ACCESS Oklahoma plan for turnpike revenue bonds, not to exceed $1 billion, at 6% interest over 32 years and secured by turnpike revenues and revenues of the Turnpike Trust Fund. The OTA noted that the full faith and credit of the State of Oklahoma is not pledged, the bonds are self-liquidating, and the terms are well inside what is required by statute.See, e.g., Application of Okla. Capital Improvement Auth., 1988 OK 25958 P.2d 759

¶11 On July 11, 2022, the Oklahoma Transportation Commission approved the three proposed turnpike routes for the Tri-City Connector, East-West Connector, and South Extension. The OTA then submitted to the Court its application for the assumption of original jurisdiction and petition for validation of the turnpike bonds. Following this Court's order and 69 O.S.2021, § 1718

STANDARD OF REVIEW

¶12 The Court has long recognized that its obligation in reviewing bonds is to determine whether the bonds facially violate the law and to examine the legal authority presented by protestants. In re Application of Okla. Tpk. Auth., 2018 OK 88431 P.3d 59

ANALYSIS

¶13 The Legislature conferred upon the Court "exclusive original jurisdiction" to hear and determine the OTA's application. 69 O.S.2021, § 1718. The Court's exclusive original jurisdiction entails:

The Authority is authorized in its discretion to file an application with the Supreme Court of Oklahoma for the approval of any bonds to be issued hereunder, and exclusive original jurisdiction is hereby conferred upon the Supreme Court to hear and determine each such application. . . . If the Court shall be satisfied that the bonds have been properly authorized in accordance with this article and that when issued, they will constitute valid obligations in accordance with their terms, the Court shall render its written opinion approving the bonds and shall fix the time within which a petition for rehearing may be filed. The decision of the Court shall be a judicial determination of the validity of the bonds, shall be conclusive as to the Authority, its officers and agents, and thereafter the bonds so approved and the revenues pledged to their payment shall be incontestable in any court in the State of Oklahoma.

68 O.S. 2021, § 1718. Protestants argue that the bonds are not valid because (1) the OTA lacks statutory authorization to construct the South Extension, and (2) the OTA has exceeded its statutory authorization by seeking an additional bond issue to complete the Loop. We address each argument in turn.

A. The OTA is statutorily authorized to construct the South Extension. 

¶14 In analyzing the authority the Legislature has given the OTA to construct the proposed turnpikes, we must first look at the standard by which we review this authority. Title 69 O.S.2021, § 1901

The provisions of this Code, being necessary for the welfare of the state and its inhabitants, shall be liberally construed to effect the purpose and objects hereof.

We are mandated to liberally construe the OTA's authority found in 69 O.S.2021, § 1705

To construct, maintain, repair, and operate turnpike projects and highways, with their access and connecting roads, at such locations and on such routes as the OTA shall determine to be feasible and economically sound; provided, that until specifically authorized by the Legislature, the Authority shall be authorized to construct and operate toll turnpikes only at the following locations . . . .

(20) All or any part of an Oklahoma City Outer Loop expressway system beginning in the vicinity of I-35 and the Turner Turnpike and extending west into Canadian County and then south to I-40; and then south and east to I-35 in the vicinity of Moore and Norman; and then extending east and north to I-40 east of Tinker Field; and then extending north to the Turner Turnpike to complete the Outer Loop.

. . . .

(28) A new turnpike and bridge or any parts thereof from a point in the vicinity of the city of Mustang southerly across the South Canadian River to the H.E. Bailey Turnpike in the vicinity of the city of Tuttle; and then easterly across the South Canadian River to a point in the vicinity of the city of Norman.

69 O.S.2021, § 1705

¶15 The locations listed by the Legislature in the subparts of § 1705(e) include the proposed locations for the Tri-City Connector and East-West Connector in § 1705(e)(20), and the South Extension in § 1705(e)(28). And we must liberally construe these subparts of § 1705(e) regarding the locations and routes of these specific turnpikes authorized by the Legislature.

¶16 The Legislature also gave the OTA broad discretion in determining access routes to the turnpikes. Subsection (j) states as follows:

(j) To designate, except as is provided for herein, the location, and establish, limit and control such points of ingress to and egress from each turnpike project as may be necessary or desirable in the judgment of the Authority to insure the proper operation and maintenance of such project, and to prohibit entrance to such project from any point or points not so designated.

69 O.S.2021, § 1705

¶17 These provisions demonstrate that the Legislature has given the OTA very broad authority to determine routes, including access and connecting roads, within the listed authorized locations. As previously held by this Court, we refuse to strictly construe these legislative authorizations and instead defer to the OTA's technical expertise in determining routes. In re Application of Okla. Tpk. Auth., 1950 OK 208221 P.2d 795

¶18 Turning to the first issue at hand, Protestants argue for a strict construction of 69 O.S.2021, § 1705

(28) A new turnpike and bridge or any parts thereof from a point in the vicinity of the city of Mustang southerly across the South Canadian River to the H.E. Bailey Turnpike in the vicinity of the city of Tuttle; and then easterly across the South Canadian River to a point in the vicinity of the city of Norman.

Subpart (28) contains two independent clauses. The second independent clause provides that the OTA should construct the South Extension to move easterly across the South Canadian River toward Norman.

¶19 If the Court is to construe this statute liberally and the OTA has the discretion to determine routes that are feasible and economically sound (like trying to avoid the densest parts of Norman), the Court must take a broader view of the proposed South Extension, rather than a turn-by-turn analysis of the proposed route. Looking at the entire route, from the H.E. Bailey Norman Spur to the end of the South Extension in Norman, the turnpike moves easterly from the Spur to Highway 9 and I-35, then easterly to the South Extension, where the turnpike then crosses the South Canadian River as required in second clause of subpart (28), and then north where it ends in the vicinity of Norman.

¶20 In authorizing bonds for a turnpike between Tulsa and Oklahoma City, the Court held that it was not "concerned with the details of construction of the road or any part thereof except the location of the ends" and approved a turnpike that terminated six miles outside of Tulsa and 15 miles outside the center of Oklahoma City. In re Application of Okla. Tpk. Auth., 1950 OK 208221 P.2d 795

 

¶21 Even more, the South Extension is an access point to the Kickapoo Turnpike, and the OTA has broad discretion to determine such points of ingress to and egress from each turnpike project. 69 O.S.2021, § 1705Application Okla. Tpk. Auth., 1952 OK 247246 P.2d 327

¶22 The Legislature has given the OTA broad authority to determine the route for the South Extension that moves easterly from the beginning point at the H.E. Bailey Spur and crosses the North Canadian River to the terminus in the vicinity of Norman. We follow the last 30 years of this Court's precedent liberally construing the OTA's discretion in designating turnpike routes by "not inquir[ing] into the matter for the purpose of demanding why some other route was not chosen." Owens v. Okla. Tpk. Auth., 1954 OK 345283 P.2d 827

B. The OTA is authorized to issue additional bonds for the construction of the Tri-City Connector and the East-West Connector. 

¶23 The next issue is whether the OTA has legislative authority to issue additional bonds to finalize the Loop with the Tri-City Connector and the East-West Connector. Title 69 O.S.2021, § 1710

¶24 Title 69 O.S.2021, § 1705

Provided that any bonds issued for the construction of the proposed turnpike referred to in subparagraphs (10), (20), (21) and (22) of paragraph (e) of this section shall be issued as one issue for all four of the proposed turnpikes and shall be financed, constructed and operated under one bond indenture.

69 O.S.2021, § 1705Id.

¶25 The Protestants ask the Court to strictly interpret § 1705(f) to conclude that the OTA was only allowed one bond issue for the entire construction of the four turnpikes. Since the OTA did not construct the entire Loop from the first bond issue in 1989, the Protestants contend that the OTA is barred from issuing any more bonds to construct the Tri-City Connector and East-West Connector.

¶26 The OTA's position is that subsection (f) was only a restriction on the first bonds issued after the Legislature passed the requirement in 1987. The OTA contends that after the first bond issue in 1989 to begin construction of the four proposed turnpikes, subsection (f) also allows the OTA to pay "all or any part of the cost of any one or more turnpike projects." 69 O.S.2021, § 1705

¶27 We have repeatedly held that the interpretation or construction of an undefined statute by the agency charged with its administration is entitled to the highest respect from the courts, especially when the administrative construction is settled and uniformly applied for several years. Oral Roberts Univ. v. Okla. Tax Comm'n, 1985 OK 97714 P.2d 1013McCain v. State Election Bd., 1930 OK 323289 P. 759Id. We have opined that an agency's own consistent administrative interpretation for a period of over 20 years must prevail over a contrary interpretation suggested for the first time. Okla. Tax Comm'n v. Liberty Nat'l Bank and Trust Co., 1955 OK 208289 P.2d 388

¶28 For the past 30 years, the Court has upheld the OTA's interpretation of 69 O.S.2021, § 1705

¶29 The Court validated the 2016 bonds relying on § 1709(A) and Application of Oklahoma Turnpike Authority, 1966 OK 139416 P.2d 860In re Application Okla. Tpk. Auth., 2016 OK 124see also 69 O.S.2021, § 1709

CONCLUSION

¶30 Title 69 O.S.2021, § 171869 O.S.2021, § 1701et seq., the Court shall render its written opinion approving the revenue bonds. The OTA has properly exercised its authority to determine the route for the South Extension. Further, the OTA has legislative authority pursuant to 69 O.S.2021, §§ 1705

ORIGINAL JURISDICTION PREVIOUSLY ASSUMED; 
PROPOSED BOND ISSUE APPROVED.

CONCUR: KAUGER, WINCHESTER, EDMONDSON, GURICH, DARBY (BY SEPARATE WRITING), J.J., AND REIF, S.J.

DISSENT: ROWE, V.C.J. (BY SEPARATE WRITING), KUEHN, J. (BY SEPARATE WRITING), AND HIXON, S.J.

RECUSED: KANE, C.J.

DISQUALIFIED: COMBS, J.

FOOTNOTES

69 O.S.2021, § 1701

In order to facilitate vehicular traffic throughout the state and remove the present handicaps and hazards on the congested highways in the state, and to provide for the construction of modern express highways embodying reasonable safety devices including ample shoulder widths, long sight distances, the bypassing of cities and towns, and grade separations at intersecting highways and railroads, the Oklahoma Turnpike Authority, as created in Section 1703 of this title, is hereby authorized and empowered to construct, maintain, repair, and operate turnpike projects as defined in Section 1704 of this title, at such locations as shall be approved by the Transportation Commission, and to issue turnpike revenue bonds of the Authority payable solely from revenues to pay the cost of such projects. The Authority is further authorized and empowered to develop and market alternative uses of the Oklahoma Turnpike Authority Electronic Toll Collection System, and construct, maintain, repair, and operate inter-modal transportation transfer facilities and infrastructure relating thereto, including, without limitation, warehouses and utility facilities and intercity rail transit projects as it shall determine to be feasible and economically sound.

69 O.S.2021, § 171862 O.S.2021, § 695.862 O.S.2021, § 695.862 O.S.2021, §§ 695.1

69 O.S.2021, § 1709

A. The Authority may provide by resolution, at one time or from time to time, for the issuance of turnpike revenue bonds of the Authority for the purpose of paying all or any part of the cost of any one or more turnpike projects. The Authority, when it finds that it would be economical and beneficial to do so, may combine two or more, or any part thereof, or all of its proposed projects into one unit and consider the same as one project to the same extent and with like effect as if the same were a single project.

 

 

DARBY, J., concurring specially:

¶1 Upon application by the Oklahoma Turnpike Authority, the Oklahoma Legislature has mandated that the Court consider and pass upon whether the proposed bonds have been properly authorized in accordance with accompanying statutes and when issued, whether the bonds constitute valid obligations in accordance with their terms. If so, the Court shall render a written opinion approving the bonds and fix a time allowing petition for rehearing. Today, we render such a written opinion - no more and no less.

¶2 The statute does not direct this Court to consider and pass upon proposed turnpike locations. But because so many have argued the Court should consider whether turnpike routes proposed by the Authority are authorized, and because such an argument could conceivably have merit, I offer the following.

¶3 The proposed locations of the turnpikes at issue do not run afoul of the applicable statutes. The Legislature has convincingly expressed its intent that so long as the proposed locations are anywhere relatively close to those described in title 69, section 1705 the Authority's decisions are final. Section 1705(28), for example, reads:

A new turnpike and bridge or any parts thereof from a point in the vicinity of the city of Mustang southerly across the South Canadian River to the H.E. Bailey Turnpike in the vicinity of the city of Tuttle; and then easterly across the South Canadian River to a point in the vicinity of the city of Norman.

69 O.S. Supp. 2013, § 1705

When a turnpike has been authorized by law to begin at a point and end at a point, it is hereby authorized to begin in the vicinity of said point and end in the vicinity of such point as described. (Emphasis added).

69 O.S.2011, § 1705.1

¶4 The Authority has proposed locations which fit within that statutory discretion.

I concur in the majority opinion.

¶5 I concur specially.

 

 

ROWE, V.C.J., with whom KUEHN, J., and HIXON, S.J., join, DISSENTING:

¶1 I dissent from the majority's opinion approving the Oklahoma Turnpike Authority's proposed bond application. I also wholeheartedly disagree with the majority's characterization of the protests filed in this matter as an invitation for this Court to "inject itself into the route-making process"In re Application of Okla. Dev. Fin. Auth., 2022 OK 41510 P.3d 165Id. The Legislature's manifest purpose in conferring this jurisdiction upon us was to ensure that the OTA does not act outside the scope of its authority and discretion and thereby contravene the law of Oklahoma--thus, our review is crucial to our system of checks and balances. To rule upon the legitimacy of the protests filed in this matter--and the valid objections contained therein--is precisely why the Legislature vested this Court with exclusive jurisdiction to review these bond applications.

BACKGROUND

¶2 In February 2022, Transportation Secretary Tim Gatz presented ACCESS Oklahoma, which stands for Advancing and Connecting Communities and Economies Safely Statewide, to the Oklahoma Turnpike Authority ("OTA") Board of Directors. ACCESS Oklahoma is a five billion dollar, fifteen-year long-range plan that addresses ongoing turnpike infrastructure needs, including improvements to existing routes and construction of new routes. The proposed route map of ACCESS Oklahoma projects contains three new construction projects (referred to as the "Tri-City Connector," the "East-West Connector," and the "South Extension") allegedly authorized under the OTA's Enabling Act, 69 O.S.2021 §§ 1701-1736 et seq.

¶3 According to the OTA, the Tri-City Connector and the East-West Connector are the final pieces of the Oklahoma City Outer Loop expressway system ("OKC Outer Loop"), one of several turnpike projects authorized by the Legislature in 1987.69 O.S.2021 § 1705

¶4 On June 9, 2022, the OTA held a special meeting and adopted (1) a Bond Resolution authorizing the issuance of turnpike revenue bonds in an amount not to exceed one billion dollars ($1,000,000,000) to finance the first phase of ACCESS Oklahoma projects; (2) a resolution authorizing the commencement of proceedings before this Court to approve the bonds pursuant to 60 O.S.2021 § 1718; and (3) a resolution authorizing the submission of an application to the Council of Bond Oversight ("COBO") for provisional and final approval of the Bonds.

¶5 The OTA submitted a request to the COBO to issue five hundred million dollars ($500,000,000) of Second Senior Revenue Bonds, Series 2022A. On August 9, 2022, the COBO voted to approve the OTA's request subject to certain conditions, including (1) the resolution or dismissal of two actions pending in the District Court of Cleveland County relating to the ACCESS Oklahoma projects, and (2) approval of the Bonds by this Court.

¶6 On August 10, 2022, the OTA filed in this Court its Application for the Assumption of Original Jurisdiction and Petition for Validation of Not to Exceed $500,000,000 Oklahoma Turnpike System Second Senior Lien Revenue Bonds, Series 2022. We issued an order the same day setting the matter for hearing on September 13, 2022, and directing the OTA to provide notice of the hearing to the public in accordance with 20 O.S.2021 § 14.169 O.S.2021 § 1718

DISCUSSION

¶7 There were four protests filed in this case. The first protest was filed collectively by a group of property owners ("Hirschfeld Plaintiffs") in Cleveland and McClain County whose land would be threatened by eminent domain if the ACCESS Oklahoma projects are approved. On May 18, 2022, the Hirschfeld Plaintiffs brought suit in Cleveland County District Court (Case No. CV-2022-1905) alleging the OTA violated various provisions of the Open Meeting Act, 25 O.S.2021 §§ 301-314. In their protest, the Hirschfeld Plaintiffs asked that we defer ruling on the OTA's application until the alleged Open Meetings Act violations could be resolved. However, since this matter has been pending, the District Court granted summary judgment to the Hirschfeld Plaintiffs. The OTA appealed, and on May 31, 2023, the Court issued an opinion, to which I dissented, reversing the District Court's judgment.

¶8 The second protest was filed by the City of Norman ("City"). City's protest focuses exclusively on the South Extension. City claims that nothing in the text of § 1705(e)(28) authorizes the construction of the South Extension. City further contends that if the OTA wishes to build the South Extension, the OTA has the capacity and should be required to seek express legislative authorization for the project.

¶9 The third protest was filed by Pike Off OTA, Inc. ("Pike Off OTA"). Pike Off OTA contends that § 1705(f) of the Enabling Act prohibits the OTA from building the Tri-City Connector and East-West Connector. Section 1705(f) gives the OTA authority:

To issue turnpike revenue bonds of the Authority, payable solely from revenues, including the revenues accruing to the trust fund created by Sections 1701 through 1734 of this title, for the purpose of paying all or any part of the cost of any one or more turnpike projects. Provided that any bonds issued for the construction of the proposed turnpike referred to in subparagraphs (10), (20), (21) and (22) of paragraph (e) of this section shall be issued as one issue for all four of the proposed turnpikes and shall be financed, constructed and operated under one bond indenture.

69 O.S.2021 § 1705

¶10 The fourth protest in this matter was filed by R. John McKay and Jo Deaton McKay ("the McKays"). The McKays also claim that the OTA lacks legislative authorization to construct the South Extension, citing reasons similar to those proffered by City and Pike Off OTA.

¶11 Collectively, these protests raise two questions as to the validity of the proposed bonds: (1) whether the OTA has the requisite statutory authorization to build the South Extension, and (2) whether the language of § 1705(f) prohibits a new bond issue for construction of the Tri-City Connector and East-West Connector as parts of the OKC Outer Loop. Both questions involve matters of statutory interpretation. When interpreting statutory provisions, we observe the following principles:

The goal of any inquiry into the meaning of a statutory enactment is to ascertain and give effect to the intent of the legislature. The law-making body is presumed to have expressed its intent in a statute's language and to have intended what the text expresses. If a statute is plain and unambiguous, it will not be subjected to judicial construction, but will receive the effect its language dictates. Only where the intent cannot be ascertained from a statute's text, as when ambiguity or conflict (with other statutes) is shown to exist, may rules of statutory construction be employed.

Yocum v. Greenbriar Nursing Home, 2005 OK 27130 P.3d 213

A. THE OTA LACKS STATUTORY AUTHORIZATION TO BUILD THE SOUTH EXTENSION.

¶12 Section 1705(e) of the OTA's Enabling Act empowers the OTA to construct, maintain, repair and operate turnpikes throughout the State. However, this power is limited to those projects expressly authorized by the Legislature in statute. See 69 O.S. § 1705

A new turnpike and bridge or any parts thereof from a point in the vicinity of the city of Mustang southerly across the South Canadian River to the H.E. Bailey Turnpike in the vicinity of the city of Tuttle; and then easterly across the South Canadian River to a point in the vicinity of the city of Norman.

The Legislature authorized this project in 1993.

¶13 All of the protests relating to the South Extension generally adhere to one consistent objection: the proposed route for the South Extension is not consistent with or contemplated by the statutory language of § 1705(e)(28). City described the proposed route of the South Extension as follows:

The "South Extension" would cross the east side of Norman [heading south] from Indian Hills Road, just west of 84th Avenue NE and Lake Thunderbird, south to East Etowah Road, until it turns southwest and crosses the South Canadian River and heads further southward into McClain County and on to I-35 just north of Purcell.

Pike Off OTA describes the route of the South Extension similarly, albeit in reverse:

Section 28 does not authorize the OTA to build a turnpike alignment that would start in the City of Purcell, run northeasterly through rural Cleveland County, continue northerly through virtually the entirety of East Norman, including Lake Thunderbird, and then finally meet with the proposed § 1705(e)(20) East-West Connector in far Northeast Norman at Indian Hills Road.

(emphasis in original).

¶14 The OTA claims that the South Extension constitutes the eastern segment of the project authorized under § 1705(e)(28) because it proceeds "easterly across the South Canadian River to a point in the vicinity of Norman." The OTA also notes that, in instances where other turnpike routes have been challenged, this Court has recognized the OTA's broad discretion to make these determinations.

¶15 At hearing, the OTA noted that the southernmost portion of the South Extension adheres to the language in the final clause of § 1705(e)(28) because it initially moves "easterly across the South Canadian River" and the project still terminates "in the vicinity of the city of Norman."

¶16 In ascertaining legislative intent, we look first to the text of the statute. Yocum, 2005 OK 27

¶17 The statute's level of specificity as to the project authorized under § 1705(e)(28) is notable. The statute provides points of origin ("from a point in the vicinity of Mustang"), landmarks and communities through which the route will proceed ("South Canadian River" and "city of Tuttle"), directional requirements ("southerly" and "easterly"), intersections with other highway systems ("to the H.E. Bailey Turnpike"), and endpoints ("to a point in the vicinity of Norman"). The Legislature clearly had the capacity to adequately describe the route of the South Extension, if the Legislature intended to authorize it. However, I cannot infer any such intent based on the text of § 1705(e)(28).

¶18 On this point, the text of the statute is sufficiently clear, and it is not necessary to look at extrinsic sources such as legislative history.

¶19 Finally, I reject the majority's position that the differences in the proposed route for the South Extension from the project described in § 1705(e)(28) fall within the OTA's discretion. It is true that where an authorized turnpike is to be built, this Court will not inquire into the matter for determining why another route was not chosen. See Owens v. Okla. Tpk. Auth., 1954 OK 345283 P.2d 827

¶20 In its effort to connect the dots, the majority trivializes the ways in which the South Extension diverges from the statutory authorization in § 1705(e)(28). The majority suggests that we look at the "entire route"

¶21 In finding that the South Extension is not authorized by statute, we would not be, as the majority suggests, injecting ourselves into the route-making process. We would not be dictating to the OTA the route for the project authorized in § 1705(e)(28). We would simply be acknowledging that the route lacks legislative authorization. The majority's boundless conception of the OTA's authority to determine routes not only undermines the Legislature with respect to this particular project but also threatens to completely untether the OTA from legislative authorization altogether. Under the majority's approach, so long as the OTA can make a speculative argument that a proposed route is authorized in whole or even in part, it is essentially free to construct whatever turnpikes it sees fit. I cannot, in good conscience, endorse such an outcome.

¶22 The majority also claims that we have "consistently refused" to substitute our judgment for the OTA's discretion in choosing turnpike routes and that to hold these routes as unauthorized would inject the Court into the decision-making process. What is left unsaid is that we are not injecting ourselves into this process: the Legislature has required our approval of these bonds, and the issues I raise today are issues that the protestants brought before us. Contrary to the majority's assertion that our precedent of the last 30 years requires us to approve these bonds, I would note that our precedent has not addressed a valid route objection, and our precedent certainly does not lead us to the majority's position today. In fact, not since 1950 have we received a protest regarding a route chosen by the OTA.

¶23 The majority further notes that these routes would alleviate the traffic burden on the Interstate 35 and Interstate 40 corridors, thereby reducing the risk to travelers on the interstates. While there may be a host of good reasons to approve these turnpike projects, the majority's consideration of these factors is a venture into the realm of policymaking, which is far beyond our purview, and is vested exclusively with the Legislature.

¶24 Finally, the majority opines that we are mandated to liberally construe the OTA's authorization found in 69 O.S. § 1705only at the following locations [....]" (emphasis added). No liberal construction of this language can lead us to conclude that an unauthorized route should be approved.

B. THE LEGISLATURE HAS NOT AUTHORIZED ISSUANCE OF ADDITIONAL BONDS FOR CONSTRUCTION OF THE TRI-CITY CONNECTOR AND THE EAST-WEST CONNECTOR.

¶25 Pike Off OTA argues that the OTA lacks authority to construct the Tri-City Connector and the East-West Connector because the OTA has already exceeded the number of bond issues authorized under § 1705(f) for construction of the OKC Outer Loop. The Legislature in 1987 granted the following authority to the OTA:

To issue turnpike revenue bonds of the Authority, payable solely from revenues, including the revenues accruing to the trust fund created by Sections 1701 through 1734 of this title, for the purpose of paying all or any part of the cost of any one or more turnpike projects. Provided that any bonds issued for the construction of the proposed turnpike referred to in subparagraphs (10), (20), (21) and (22) of paragraph (e) of this section shall be issued as one issue for all four of the proposed turnpikes and shall be financed, constructed and operated under one bond indenture.

69 O.S.2021 § 1705

¶26 The OTA claims that it satisfied the mandate of § 1705(f) with the 1989 bond issue that was used to construct parts of the OKC Outer Loop and the other projects referenced in § 1705(f).

¶27 In determining the meaning and effect of § 1705(f), we look first at its text. The text of § 1705(f) is explicit in that it limits financing of the OKC Outer Loop project to one bond issue directed at all of the projects referenced in § 1705(f).

¶28 The OTA's argument that it has complied with § 1705(f) is not persuasive. Even if the OTA is correct that it has satisfied the "one bond indenture" requirement in § 1705(f) because the proposed bonds here would operate under the same trust agreement as those issued previously, the OTA still lacks statutory authorization for the proposed bond issue. The text of § 1705(f) expressly limits funding for the four projects mentioned to one bond issue. The proposed bonds constitute a subsequent bond issue which is beyond the statute's authorization.

¶29 While the text of § 1705(f) is sufficiently clear to resolve this question--and it is not necessary to look beyond the statute's text--Pike Off OTA has submitted compelling evidence of the Legislature's intent in 1987, which further supports the conclusion that this bond issue is not permitted. Specifically, Pike Off OTA submitted a series of news articles from 1988 referencing the projects in § 1705(f) and describing the financing and construction of the projects as an "all-or-nothing proposition."

CONCLUSION

¶30 The majority's decision confers upon the OTA incredibly broad discretion without any cognizable limits. The OTA is apparently free to blatantly disregard the Legislature's directives with respect to routes and funding. This decision does not simply approve the proposed bonds, it sets a new precedent that future bond applications seeking our approval are merely seeking our rubber stamp--which we freely give today. I find the majority's holding to be plainly contrary to Oklahoma law, and as such, I must respectfully dissent.

FOOTNOTES

69 O.S.2021 § 1718

All or any part of an Oklahoma City Outer Loop expressway system beginning in the vicinity of I-35 and the Turner Turnpike and extending west into Canadian County and then south to I-40; and then south and east to I-35 in the vicinity of Moore and Norman; and then extending east and north to I-40 east of Tinker Field; and then extending north to the Turner Turnpike to complete the Outer Loop.

69 O.S.2021 § 1705

A new turnpike and bridge or any parts thereof from a point in the vicinity of the city of Mustang southerly across the South Canadian River to the H.E. Bailey Turnpike in the vicinity of the city of Tuttle; and then easterly across the South Canadian River to a point in the vicinity of the city of Norman.

Hirschfel v. Oklahoma Turnpike Authority, 2023 OK 59

See In re Application Of Okla. Tpk. Auth., 1950 OK 208221 P.2d 795

[W]e assume it to be within the discretion of the proper authorities to so construct such a toll road and to so construct this toll road. It does not appear that this point presents the slightest abuse of discretion, and certainly it does not disclose any violation of the Turnpike Act ....

Id.

Reading Law: The Interpretation of Legal Texts 56 (2012)).

See Appendix of Petition, Vol. II, Exhibit V. Below is a copy of the project maps submitted by the OTA: 

Patterson v. Beall, 2000 OK 9219 P.3d 839expressio unius est exclusio alterius' that the mention of one thing in a statute impliedly excludes another thing, is used to determine legislative intent.").

A verbis legis non est recedendum ("Do not depart from the words of the law"). Scalia & Garner, supra, at 56.

See H.B. 1459, 47th Leg., 1st Sess. (Okla. 1999); S.B. 371, 47th Leg., 1st Sess. (Okla. 1999).

See Pike Off OTA's Appendix to Protest, Exhibits U and V. According to their respective Bill Information pages obtained on the Legislature's website, neither HB 1459 nor SB 371 made it out of committee, nor received a vote in either chamber.

Id.

Id.

1950 OK 208221 P.2d 795

In re Application of the Oklahoma Turnpike Authority, 2016 OK 124389 P.3d 318See In re Application of Okla. Dev. Fin. Auth., 2022 OK 41510 P.3d 165

supra, at 69 ("Words are to be understood in their ordinary, everyday meanings--unless the context indicates that they bear a technical sense.").

See Pike Off OTA's Appendix to Protest, Exhibits I, J, K, L, M; Price Tag May Slow Turnpikes, Sapulpa Daily Herald, Feb. 10, 1988 ("A law passed by the 1987 Legislature permits the authority to build the Oklahoma City, Tulsa and Chouteau-Siloam Springs roads only if it also builds a turnpike from Davis to Henryetta."); Paul English, Splitting Toll Road Package Urged, The Daily Oklahoman, Mar. 18, 1988, at 25 ("[T]he 1987 law requires that at least part of four proposed turnpikes be included in the financing package."); Ron Jenkins, Fuss Over 2-Lane Turnpike Idea Heats Up, Oklmulgee Times, Aug. 26, 1988 (quoting Governor Henry Bellmon as describing the four turnpike projects as an "all-or-nothing proposition."); Paul English, Leg of City Turnpike Proposed, The Daily Oklahoman, Apr. 22, 1988 ("The 1987 Legislature approved building of four toll roads, but only if part or all of the four roads were built at the same time."); John Grelner, Bellmon Seeks Turnpike Study, The Daily Oklahoman, Aug. 8, 1988 ("Under current law, only one turnpike bond indenture can be issued for that package which includes a north outer loop in Oklahoma City, a south bypass in Tulsa, a turnpike from to Tulsa to the Arkansas border, and one from Ada to Davis.").

See Pike Off OTA's Appendix to Protest, Exhibits N and O; Legislators May Weigh Solution to Turnpike Issues, The Daily Oklahoman, July 5, 1988 ("Bellmon has said he would like to see all the turnpikes built, but recent studies again have shown the Davis route to be unfeasible."); Tim Chavez, State Economic Growth Bill Killed, The Daily Oklahoman, July 14, 1988.

 

 

KUEHN, J., DISSENTING:

¶1 The Majority suggests that this Court must authorize OTA's requested bonds. The Majority further suggests that, despite being directly asked to determine whether the proposed routes are authorized by statute, this Court should not question the proposed routes, but should defer to an agency, the Oklahoma Turnpike Authority.

¶2 I disagree. First, I would find Title 69, Section 1718, requiring this Court to approve OTA bonds, improperly delegates executive authority to this Court and is unconstitutional. The Oklahoma Constitution gives this Court appellate jurisdiction over civil cases at law and in equity, and original jurisdiction including "general superintending control over all inferior courts and all Agencies, Commissions and Boards created by law." Ok. Const. art. 7, § 4. The statute requires the Court to perform a ministerial duty which is not within the scope of our constitutional role of traditional judicial review.

¶3 Second, if we are to give effect to Section 1718, we must determine the merits of any protests to the bond issue. This Court may exercise its discretion to determine whether any given proposal should be approved. And implicit in the authority to approve is the authority to disapprove.

This Court Should Not Issue an Advisory Opinion on Bond Approval

¶4 The ACCESS Oklahoma proposal has generated significant controversy and many lawsuits. However, the matter before us does not arise from any legal case or controversy. When the Legislature gave the OTA the authority to issue bonds, it included two layers of oversight. The first was unremarkable: any bond issue must be approved by the Council of Bond Oversight. 69 O.S. § 170969 O.S. § 171869 O.S. § 1718

¶5 This Court has never been asked to decide the underlying premise of section 1718 itself. In the years after the Turnpike Act was first enacted, protesters argued that the notice provisions connected to OTA's applications to this Court were insufficient to satisfy due process. We held that the provisions for a hearing, timely notice by publication, and appearances at the hearing to register protest, combined with the opportunity for briefing on protest issues, written offers of proof, and argument, satisfy due process concerns. In re Oklahoma Tpk. Auth., 1950 OK 208221 P.2d 795In re Application of Oklahoma Tpk. Auth., 1966 OK 139416 P.2d 860

¶6 In 1950, when first concluding there was no due process violation, this Court mentioned in passing an 1896 United States Supreme Court case, Tregea v. Board of Directors of Modesto Irrigation Dist., 164 U.S. 179 (1896). There, the California Legislature had authorized irrigation districts to issue bonds and provided for a judicial determination of the bonds' validity. After an election at which voters approved the bonds, the irrigation district board filed a petition for a judicial determination of validity. Our opinion appeared to use Tregea as justification for the constitutionality of Oklahoma's law requiring this Court to conduct a bond validation proceeding. However, that is not at all what Tregea held.Id. at 185. The Court determined that the California procedure, in which the board submitted a bond proposal for judicial validation before any bonds had issued, was merely a measure to secure evidence of the regularity of the irrigation district proceedings. Id. at 186. The evidence secured before the district court might be used in some further adversary action, but the hearing in district court was not itself an adversary proceeding. As there was no case or controversy for the Supreme Court to determine, the appeal was dismissed. Id. at 189. That is, the state legislature might have provided that a district court hold a ministerial fact-finding hearing, but the hearing did not constitute a judicial proceeding, and its findings and conclusions had no binding legal effect on future adversary proceedings. The district courts were not exercising a judicial function.

¶7 Over the years, various members of this Court have come to the same conclusion. In 1989, this Court approved bonds for the four turnpike projects outlined in Title 69, Sections 1705(e), (f). In re Appl. of Oklahoma Tpk. Auth., 1989 OK 21770 P.2d 16Id. ¶ 13, 770 P.2d at 21. Consequently, the Court limited itself to finding that the bond issue was legally and properly authorized, that the protesters had notice and an opportunity to be heard, and that the grounds of protest were considered. Id. ¶ 22, 770 P.2d at 23. Justice Wilson, joined by Justice Kauger, specially concurred by reason of stare decisis; she noted that the Legislature failed to either provide any judicial standard of review or specify that the Administrative Procedures Act applied, leaving this Court "constrained to approve" the bonds. Id. ¶ 1, 770 P.2d at 24 (Wilson, J., specially concurring). Justice Opala went even further. In explaining why he did not participate in the decision, he stated, "the court today is called upon to reexamine a purely executive decision." He continued,

"For all practical purposes, the court's function today is statutorily confined to a four corners' examination of documentation compiled by the agency acting in a nonadjudicative capacity. By force of applicable law the protests are thus restricted to the facial correctness of the agency's paperwork. There is no opportunity for any meaningful forensic inquiry into the quality of the agency's decisionmaking that preceded its resolve to issue the bonds. . . . Because the task I am called upon to perform leaves me no range of judicial alternatives and hence appears as but an empty act of supererogation, I abstain from sitting in consideration of this cause."

Id. ¶ 1-2, 770 P.2d at 24 (Opala, V.C.J., not participating) (emphasis in original).

¶8 In 2018, Justices Wyrick and Colbert dissented from the Court's opinion approving turnpike bonds, stating, "The Court lacks jurisdiction to render this advisory opinion." In re Application of Oklahoma Tpk. Auth., 2018 OK 88431 P.3d 59Id. ¶ 5, 431 P.3d at 60-61. Without a legally or factually supported reason to disapprove the application, it was granted. Id. ¶ 7, 431 P.3d at 62.

¶9 I agree with Justices Opala, Wyrick, Colbert, Wilson, and Kauger. Section 1718 provides this Court with no case or controversy, nothing to determine, nothing to decide. We are not an adjunct of the executive branch, and we should not act as a rubber stamp, approving the paperwork for purely executive decisions. In fact, the final clause of Section 1718 makes this Court's approval worse than a rubber stamp. The statute provides that our decision is "conclusive" and "thereafter the bonds so approved and the revenues pledged to their payment shall be incontestable in any court in the State of Oklahoma." 69 O.S. § 1718

The Bond Issue is Not Authorized by Statute

¶10 Interpreting Section 1718 to allow this Court some judicial discretion, I would not approve the bond request. In 1987, the Legislature granted the OTA limited authority to issue bonds:

To issue turnpike revenue bonds of the Authority, payable solely from revenues, including the revenues accruing to the trust fund created by Sections 1701 through 1734 of this title, for the purpose of paying all or any part of the cost of any one or more turnpike projects. Provided that any bonds issued for the construction of the proposed turnpike referred to in subparagraphs (10), (20), (21) and (22) of paragraph (e) of this section shall be issued as one issue for all four of the proposed turnpikes and shall be financed, constructed and operated under one bond indenture.

69 O.S. § 1705

¶11 Any interpretation of a statute starts with the text, and I find the text of Section 1705(f) is unambiguous. The explicit language limits financing of the Outer Loop project to a single bond issue in combination with the other specified projects. It suggests neither that the Outer Loop may be funded by a separate, single issue, nor that the OTA may seek multiple bond issues over the course of the more than thirty years since Section 1705(f) was enacted.

¶12 In 1989, this Court approved the OTA's request for a single bond issue to construct turnpike sections under all four subsections as required by Section 1705(f). In re Appl. Oklahoma Tpk. Auth., 1989 OK 21770 P.2d 16

¶13 I am satisfied that the text of Section 1705(f) does not authorize these bonds. However, the protesters also offered evidence of the Legislature's intent to tie all the construction to a single bond. News articles from 1988 describe the financing and construction of the turnpike projects. A Sapulpa paper noted that the law allowed the Oklahoma City, Tulsa and Siloam Springs turnpikes only if one was also built from Davis to Henryetta. Price Tag May Slow Turnpikes, SAPULPA DAILY HERALD, Feb. 10, 1988. The Oklahoman reported that the OTA asked legislators to repeal Section 1705(f), as it required turnpikes to be "built as a package or not at all", that Governor Bellmon said without a change in the law "we won't be able to do anything." Paul English, Splitting Toll Road Package Urged, THE DAILY OKLAHOMAN, Mar. 18, 1988 at 25. Legislators were asked to remove or amend a provision "that if one of the turnpikes was shown to be unfeasible, none of the other three could be built"; but that bill was rejected on the last day of the 1988 legislative session. Legislators May Weigh Solution to Turnpike Issues, THE DAILY OKLAHOMAN, July 5, 1988; Tim Chavez, State Economic Growth Bill Killed, THE DAILY OKLAHOMAN, July 14, 1988. Later that summer, Governor Bellmon stated, "It's the Legislature that has tied all four of these facilities together and made it an all-or-nothing proposition." Ron Jenkins, Fuss Over 2-Lane Turnpike Idea Heats Up, OKMULGEE TIMES, Aug. 26, 1988.

¶14 The Majority fails to address either the plain statutory language or contemporary reporting, let alone refute them. Instead, the Majority argues that this Court should defer to OTA's own interpretation of Section 1705(f). I agree that under our current caselaw, a court should usually defer to an agency's consistent prior interpretation of a statute, unless we are given cogent reasons not to.Oral Roberts Univ. v. Oklahoma Tax Comm'n, 1985 OK 97714 P.2d 1013Scott v. Oklahoma Secondary Sch. Activities Ass'n, 2013 OK 84313 P.3d 891quoting Conservation Law Foundation v. Evans, 209 F.Supp.2d 1, 8 (D.D.C. 2001)). But this deference doctrine doesn't even apply here, because there's been no decision regarding multiple bond issues. The Majority finds that this Court and OTA have consistently allowed multiple bond issues under Section 1705(f). But neither this Court nor the OTA has addressed this in the last thirty years. The OTA has simply ignored the statute. We cannot give deference to the OTA interpretation of the statute, as the OTA's argument is that the one-bond restriction in Section 1705(f) does not apply to this proposal, and that since 1989 OTA has been free to request other bonds. This isn't an interpretation of the statute. It's a rejection of it.

¶15 And this Court has never interpreted this aspect of Section 1705(f). I don't dispute that this Court has consistently approved OTA's bond requests, including a request involving construction of part of the Oklahoma City Outer Loop under Section 1705(f). In re Application of Oklahoma Tpk. Auth, 2016 OK 124389 P.3d 318In re Appl. Of Oklahoma Dev. Fin. Auth., 2022 OK 41

¶16 Of course, OTA's bond request encompasses more than just ACCESS Oklahoma and the Tri-City Connector, East-West Connector, and South Extension Outer Loop sections. In theory, we might consider separating out those components of the overall proposal and approve the portion of the bonds that apply to the remainder of the bond requests. However, OTA has neither suggested that the bond request is severable or provided any authority for severing portions of the application. Consequently, I would not approve the bond application.

¶17 Because I would not approve the bonds, there is no need to address the question of the South Extension. I dissent.

FOOTNOTES

Tregea, 163 U.S. at 182-183 (Synopsis). The actual issue on appeal was whether approval of both bond issues deprived the protestant of property without due process.

 see Jeffery S. Sutton Who Decides? States as Laboratories of Constitutional Experimentation, Chapter 6 sec.(C) (Oxford 2021).